311 Ga. 478
FINAL COPY

S21A0075.  ABBOTT v. THE STATE.

LaGrua, Justice.

Appellant Emerson Mack Abbott was tried by a Floyd County jury and found guilty of murder and numerous other crimes arising from the shooting deaths of James and Myra Reeves.[1] On appeal, Appellant contends that the trial court erred in allowing a witness

---

[1] The crimes occurred on January 23, 2015.  In May 2015, a Floyd County grand jury indicted Appellant, charging him with two counts of malice murder, two counts of felony murder, two counts of burglary, four counts of aggravated assault, two counts of aggravated battery, and one count each of armed robbery, theft by deception, and possession of a weapon during the commission of a crime.  Appellant was tried before a jury in April 2018 and found guilty on all counts.  On July 10, 2018, the trial court sentenced Appellant to two consecutive terms of life in prison without the possibility of parole for the malice murder counts; a consecutive five-year term for the weapon-possession count; and various concurrent terms for the first of the two burglary counts, the armed robbery count, and the theft by deception count.  The other counts merged or were vacated by operation of law.  Appellant filed a timely motion for new trial, and the trial court denied the motion in an order entered on October 16, 2019.  After his first notice of appeal, filed six days late and directed to the Court of Appeals, was transferred to this Court and dismissed as untimely, Appellant was granted an out-of-time appeal on June 5, 2020. Appellant then filed a timely notice of appeal, and this case was docketed to the term of this Court commencing in December 2020 and thereafter was submitted for a decision on the briefs.

to testify at trial while under the influence of alcohol and in admitting evidence of a prior act of theft. Appellant also contends that the State failed to disclose an agreement with a testifying witness, in violation of *Brady v. Maryland*, 373 U. S. 83 (83 SCt 1194, 10 LE2d 215) (1963). We discern no error, and thus we affirm.

The evidence presented at Appellant's trial showed that, shortly after 3:00 p.m. on January 23, 2015, James and Myra Reeves were found dead in their Floyd County home, both victims of recently inflicted shotgun wounds. The door leading into the home from the carport, which was not visible from the street, had been shot through. The home was otherwise in good order and undisturbed.

At the time, Appellant lived next door to the Reeveses with his girlfriend, Kelly McCleskey. The two properties were separated by a wooded area with a fence that had an opening between the properties. McCleskey testified that, on January 23, she awakened from a nap in the early afternoon and tried unsuccessfully to reach Appellant on his phone, after which, at around 2:35 p.m., Appellant

2

"[came] up walking out of the pasture," and then left the house in his truck to pick up McCleskey's 13-year-old daughter, Beth, from school. Beth testified that on the afternoon of January 23, Appellant was late picking her up and, when he did arrive, she noticed that he was in possession of a large amount of cash.

According to one of the lead investigators, Appellant became a person of interest after he repeatedly "interjected" himself into the investigation by initiating contacts with law enforcement officers. In the course of his several interviews with investigators in the days following the crimes, investigators noted inconsistencies in Appellant's statements as to the chronology of his activities on the afternoon of the murders and as to certain basic facts, such as whether he owned a shotgun and whether he had ever been inside the Reeveses' home.

In early February, investigators were alerted to a $7,500 check that had been cashed against the Reeveses' SunTrust bank account on the afternoon of the murders. Investigation revealed that the payee was Appellant, whose image was captured in bank security

3

camera photos showing him at the bank at 3:10 p.m. on January 23. On that same afternoon, Appellant went to a title pawn shop near the SunTrust branch and paid more than $4,000 in cash to redeem a car that had been recently repossessed.

Evidence showed that the repossessed car had belonged to McCleskey, until Appellant forged her signature to transfer the title to himself and pawned the title for cash. Appellant then failed to repay the loan, and the car was repossessed; January 23 was the final day of its redemption period. After Appellant's arrest, McCleskey also discovered that $5,000 was missing from her bank account and that the balance in her child support debit account had been drawn down without her knowledge.

In an interview after the discovery of the SunTrust check, GBI Special Agent Earl Glover asked Appellant whether he had ever borrowed money from or done any work for the Reeveses. Appellant told Agent Glover that he had recently agreed to remove some trees from the Reeveses' property but did not volunteer that he had received any payment for this work. Later in the interview, when

asked specifically whether he had already been paid for the job, Appellant admitted that he had, acknowledging for the first time the $7,500 check he had cashed. Appellant told Agent Glover that he had needed the money up front to purchase the tree removal equipment, but ultimately admitted that he had never made such a purchase. And, while initially claiming he still had the $7,500, Appellant later admitted he had spent it. Though Appellant told Agent Glover that Myra had given him the check at the Reeveses' home on either the Tuesday or Wednesday before the murders, evidence reflected that the Reeveses had been in Alabama on those dates.

Additional testimony reflected that, one week after the murders, Appellant called police to report that a threatening message had been painted on the storm door of his and McCleskey's home. Upon investigation, officers noted with suspicion that the message had been written neatly, as though the perpetrator had not been in a hurry. In the course of his interview that evening, Appellant told the responding officer that there had been several

5

recent prowling incidents around his home and that a four-wheeler belonging to McCleskey had recently been stolen from their property. However, police records showed that no such incidents had ever been reported, and the four-wheeler was later discovered at the residence of Appellant's mother.

There was also evidence that Appellant had knowledge of non-public information about the murders. Beth McCleskey's boyfriend, Reed Jackson, testified that, in a conversation two days after the murders, Appellant told Jackson that whoever had killed the Reeveses "shot [James] in the chest, and they made the woman crawl to the back bedroom, and then that's where she was shot, and on the way back out, they shot him again to make sure he was dead."

Appellant was arrested for the murders on February 24, 2015. One of Appellant's jail cellmates, Michael Lehr, testified that, while Appellant never explicitly admitted to committing the murders, he made numerous statements strongly suggestive of his involvement. Lehr testified that Appellant told him he "[j]ust never thought that January day would ever catch up" and stated on various occasions,

6

"you can't do ballistics on a shotgun"; "[i]f I hadn't messed with that damn check"; and "I was thinking of going to Mexico. Too late now. I'm f**ked!" Appellant also made statements to the effect that he was certain he would never be a suspect, as he believed "this whole damn deal would fall on" the Reeveses' son, who was "strung out on drugs" and thus "[t]he cops would think he did it for the money." According to Lehr, Appellant often mumbled in his sleep, and in one such instance, Appellant said, "once I saw all the blood, and using a shotgun, it felt like an awesome rush at the time."[2]

1. In his first enumeration of error, Appellant contends that the trial court erred by allowing McCleskey to testify because she was under the influence of alcohol when she appeared at trial. The record reflects that McCleskey, who admitted to being a "serious alcoholic," was found to have a blood-alcohol content of 0.03 on the morning she appeared to testify at Appellant's trial. Consequently,

---

[2] Appellant does not challenge the sufficiency of the evidence supporting his convictions, and we no longer routinely consider sufficiency sua sponte in non-death penalty cases. See *Davenport v. State*, 309 Ga. 385, 399 (4) (b) (846 SE2d 83) (2020).

the prosecutor deferred calling McCleskey and proceeded with another witness, while McCleskey waited, under supervision, elsewhere in the courthouse. Several hours later, and only after her blood-alcohol content was confirmed to have returned to zero, McCleskey was called to testify. During her testimony, McCleskey admitted that she had been drinking alcohol on the previous evening but stated that she had not consumed any alcohol that day. At no time did Appellant object to proceeding with McCleskey's testimony.

Because Appellant failed to object, we review this enumeration for plain error only. See OCGA § 24-1-103 (a) (1), (d). To establish plain error, Appellant must not only show the existence of an error but also show that

> (1) the error was not affirmatively waived by the appellant; (2) the error is "clear or obvious, rather than subject to reasonable dispute"; (3) the error "affected the appellant's substantial rights"; and (4) "the error seriously affects the fairness, integrity or public reputation of judicial proceedings."

*McGarity v. State*, ___ Ga. ___, ___ (2) (856 SE2d 241) (2021) (citation omitted). Here, there was no evidence that McCleskey was in any

8

way impaired at the time she testified. To the contrary, the evidence showed that her blood-alcohol content had returned to normal, and Appellant identifies no instances in which McCleskey appears to have responded to questioning inappropriately. Accordingly, there was no error, much less any plain error, in the trial court's allowing her to testify. See *Geter v. State*, 231 Ga. 615, 617 (203 SE2d 195) (1974) (no error in permitting testimony of witness who was under effects of medication and suffering from drug addiction but was shown to be lucid and alert). This enumeration is therefore without merit.

2. Appellant next contends that the trial court erred by admitting, as intrinsic evidence, testimony about the theft of McCleskey's four-wheeler. Appellant asserts that the evidence did not constitute intrinsic evidence and should have been subject to, and held inadmissible under, OCGA § 24-4-404 (b) (providing that "other acts" evidence is admissible only for limited purposes). Appellant asserts further that, even if the evidence was properly classified as intrinsic, it should have been excluded under OCGA §

24-4-403 ("[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice").  We discern no abuse of discretion in the admission of this evidence.

At a pretrial hearing, the State contended that the theft of the four-wheeler was part of a series of financially motivated crimes, including the unauthorized pawning of McCleskey's car title and theft of her cash, perpetrated by Appellant during the period leading up to the murders.  The State contended further that, as part of his plan to commit the murders, Appellant had been spreading word among his neighbors about crimes in the area to make it appear that the murders were part of a "sort of reign of terror that had been going on in the neighborhood."  As the State also noted, Appellant had made reference to the theft of the four-wheeler in some of his statements to police after the murders.  The trial court held that evidence of Appellant's theft of the four-wheeler was admissible as intrinsic evidence, finding that it was "necessary to complete the story of the crime" and "form[ed] an integral and natural part of the account of the crime."

As we have previously explained, "the limitations and prohibition on 'other acts' evidence set out in OCGA § 24-4-404 (b) do not apply to 'intrinsic evidence.'" *Smith v. State*, 302 Ga. 717, 725 (4) (808 SE2d 661) (2017) (citation and punctuation omitted). "Intrinsic evidence" is defined as evidence that (1) pertains to an uncharged offense arising from the same transaction or series of transactions as the charged offense; (2) is necessary to complete the story of the crime; or (3) is inextricably intertwined with the evidence regarding the charged offense. See *Harris v. State*, 310 Ga. 372, 377 (2) (b) (850 SE2d 77) (2020).

> Evidence pertaining to the chain of events explaining the context, motive, and set-up of the crime, is properly admitted if it is linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury. . . . And this sort of intrinsic evidence remains admissible even if it incidentally places the defendant's character at issue.

*Smith*, 302 Ga. at 725 (4) (citation and punctuation omitted). On appeal, we review the admission of intrinsic evidence for an abuse of discretion. See id. at 725-726 (4).

11

Here, we discern no abuse of discretion in the trial court's determination that the alleged theft of the four-wheeler qualified as intrinsic evidence. In assessing whether evidence is "necessary" in this context, we have noted that "'necessary' is not used in a strictly literal sense, but rather, refers to what evidence is reasonably necessary for the State to complete the story of the crime." *Harris*, 310 Ga. at 379 (2) (b). In this case, the theft of the four-wheeler occurred in the weeks leading up to the murders, during the same period of time when Appellant was shown to have pawned the title to McCleskey's car without her knowledge and stolen thousands of dollars in cash from her. As such, the theft formed part of the chronology of Appellant's crimes leading to the murders, offering insight into his motive. See, e.g., *McKelvey v. State*, ___ Ga. ___, ___ (3) (855 SE2d 598) (2021) (evidence of prior crime was properly admitted as intrinsic evidence where it pertained to chain of events leading to charged crimes and helped explain the defendant's motive); *Priester v. State*, 309 Ga. 330, 333 (2) (845 SE2d 683) (2020) (evidence of defendant's drug-dealing was properly admitted as

intrinsic evidence because it was relevant to an understanding of the motive for the charged crimes). Moreover, after the murders, Appellant himself told investigators about the theft, feigning ignorance about the vehicle's whereabouts, as part of his narrative about a spate of recent crimes in the area. The theft thus also figured into Appellant's attempt to deflect blame from himself for the murders, providing evidence of premeditation and showing the "set-up of the crime." *Smith*, 302 Ga. at 725 (4). Accordingly, there was no abuse of discretion in classifying this evidence as intrinsic.

Appellant also claims that, even if properly classified as intrinsic, the evidence was highly prejudicial and thus should have been excluded under OCGA § 24-4-403. However, we see no abuse of discretion in the trial court's concluding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. See *Harris*, 310 Ga. at 379 (2) (b) (where defendant's prior violent acts provided context to other witnesses' accounts, probative value of that evidence was not substantially

outweighed by danger of unfair prejudice); *Smith v. State*, 307 Ga. 263, 273 (2) (c) (834 SE2d 1) (2019) (where defendants' ongoing drug use and possible drug dealing "gave further context" for incidents leading to charged crimes, probative value of that evidence was not substantially outweighed by danger of unfair prejudice).

3. In his final enumeration, Appellant contends that the State violated *Brady* by failing to disclose an agreement with Lehr regarding his trial testimony. Appellant claims that, shortly after reporting Appellant's statements about the murders, Lehr entered a guilty plea on an aggravated assault charge on highly favorable terms — receiving only probation — and a warrant pending against him in Alabama was dismissed. Noting Lehr's testimony that the detective with whom he spoke told him to keep notes of Appellant's incriminating statements and offered to "write a letter" to the district attorney's office on Lehr's behalf, Appellant contends this evidence reveals the existence of a deal with Lehr that the State failed to disclose. We discern no error.

It is well settled that

14

the [S]tate is under a duty to reveal any agreement, even an informal one, with a witness concerning criminal charges pending against that witness, and a failure to disclose such an agreement constitutes a violation of the due process requirements of *Brady v. Maryland*.

*Younger v. State*, 288 Ga. 195, 200 (4) (702 SE2d 183) (2010) (citations and punctuation omitted). Further,

[t]o prevail on a *Brady* claim, a defendant must show that the State possessed evidence favorable to the defendant; [the] defendant did not possess the evidence nor could he obtain it himself with any reasonable diligence; the prosecution suppressed the favorable evidence; and had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceeding would have been different.

Id. (citation and punctuation omitted) As explained below, Appellant's *Brady* claim fails for the simple reason that he has failed to establish the existence of any deal between Lehr and the State.

At trial, Lehr testified that he reported Appellant's incriminating statements because he found them "quite disturbing" and they bothered his conscience. Lehr testified that he never asked for anything in exchange for his cooperation and that, while the investigator had offered to write a letter to the prosecutor on his

15

behalf, to Lehr's knowledge, the investigator had never done so. Lehr testified further that no one had offered him anything in exchange for his testimony and that his assistance in Appellant's case was never mentioned in the course of his plea negotiations. This testimony was supported by the certified copy of Lehr's conviction, which reflects that his probation on the aggravated assault was not conditioned on his testimony in Appellant's case. In addition, in a colloquy during Lehr's testimony at trial, the prosecutor denied the existence of any agreement. See *Sherman v. City of Atlanta*, 293 Ga. 169, 174 (4) (744 SE2d 689) (2013) (unless objected to by opposing counsel or the court, an attorney's statement in place will be accepted as true without further evidence or confirmation). In light of this evidence, and in the absence of any evidence to the contrary, Appellant's assertion that the State made a deal with Lehr amounts to nothing more than speculation. See *Brannon v. State*, 298 Ga. 601, 605 (3) (a) (783 SE2d 642) (2016) ("[M]ere speculation is insufficient to substantiate [a] claim that the State withheld exculpatory evidence[.]"). Accordingly, Appellant's

claim in this regard fails.

*Judgment affirmed. All the Justices concur.*


Decided May 17, 2021.

Murder. Floyd Superior Court. Before Judge Durham.

*William B. Mills*, for appellant.

*Leigh E. Patterson, District Attorney, Natalee L. Staats, James C. Wyatt, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Leslie A. Coots, Assistant Attorney General*, for appellee.