NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: March 5, 2024

S24A0095. JENNINGS v. THE STATE.

LAGRUA, Justice.

Appellant Savanna Jennings was convicted of malice murder and related charges in connection with the shooting death of her grandfather, Otha Perrin, Sr.[1] On appeal, Jennings contends that:

---

[1] The crimes occurred on January 3, 2018. On January 22, 2018, an Elbert County grand jury indicted Jennings, William Peterson, and Dakota Street for malice murder (Count 1), possession of a firearm during the commission of a felony (Count 2), felony murder (Count 3), two counts of aggravated assault (Counts 4 and 5), possession of a firearm during the commission of a felony (Count 6), and concealing the death of another (Count 7). Peterson was also indicted for an additional count of felony murder (Count 8) and for possessing a firearm as a convicted felon (Count 9).

Peterson and Street pleaded guilty prior to trial and testified as witnesses for the State. Jennings was tried in August 2019, and the jury found her guilty of all counts. She was sentenced to serve life in prison without the possibility of parole for malice murder (Count 1), five years in prison consecutive for possession of a firearm during the commission of a felony (Count 2), and ten years in prison consecutive for concealing the death of another (Count 7). Counts 3, 4, 5, and 6 were merged or vacated by operation of law. In total, Jennings received a sentence of life in prison without the possibility of parole plus 15 years in confinement. Jennings filed a timely

(1) the trial court abused its discretion by admitting other-acts evidence; (2) the trial court abused its discretion by admitting certain business records; and (3) her trial counsel provided constitutionally ineffective assistance. For the reasons that follow, these claims fail, and we affirm Jennings's convictions.

The evidence presented at trial showed that William Peterson shot Perrin, and Jennings was a party to the crime because she intentionally aided or abetted Peterson in the shooting or she intentionally advised, encouraged, hired, counseled, or procured Peterson to commit the crime. See OCGA § 16-2-20 (b) (3) and (4).

Jennings and her brother lived in Elberton intermittently with their grandparents since they were young children. In 2015, their grandmother passed away, and Jennings and her newborn son moved back in with Perrin the next year. During that same year, she asked Justin Cain, the father of her son, "Would you tell me how

---

motion for new trial, which was amended through new counsel. After holding an evidentiary hearing, the trial court denied the motion for new trial on June 12, 2023. Jennings filed a timely notice of appeal, and her case was docketed to this Court's term beginning in December 2023 and submitted for a decision on the briefs.

to get away with killing someone?" and "Would you tell me how to get away with killing my granddad?" Cain laughed it off, and they did not speak about it again.

Also in 2016, Jennings began dating William Peterson. In March 2017, Peterson was arrested for and eventually convicted of false imprisonment regarding an incident with Jennings. After this incident, Jennings and Peterson did not have any contact with each other for approximately six months. In September 2017, Jennings and Peterson reconnected, and Jennings told Peterson that Jennings's great-uncle had molested her as a child and Perrin "made Jennings forgive" her granduncle. Peterson testified that he and Jennings "talked about . . . killing [Perrin]." But Jennings testified that she only "discussed wanting [Perrin] dead." At some point after this conversation, Jennings moved to East Point, Georgia, but in December 2017, she moved back in with Perrin. Dakota Street, a friend of Jennings's brother, also moved in with Perrin and Jennings around this time.

On December 25, 2017, Jennings and Peterson reconnected

again at a Christmas gathering. Peterson testified that Jennings told him something that "bothered [him]" and he "thought about it for the next week or so." Jennings testified that the "something" she told Peterson was that Perrin "had pulled a gun out on me and my son while we was in the bed because he thought we was somebody else in the house there to rob him, and -- Oh, and that he was touching on me." Jennings also testified that she told Peterson she wanted Perrin dead.

Nine days later, on January 3, 2018—the night of the murder—Jennings picked up Peterson and drove him to Perrin's house. Several witnesses gave differing accounts of what was discussed that evening. Peterson testified that he told Jennings and Street that he was going to kill Perrin, but "they thought he [said it in] a joking way." In contrast, Street testified that Jennings told him that she and Peterson "were [going to try] to strangle [Perrin] in his sleep . . . put a pillow case over him or a pillow over him to make it seem like he died in his sleep." During Jennings's testimony, she said Peterson made a comment early in the evening that "if [he were] to

4

kill someone, [a relative's pond] is where [he] would put them," but she denied asking Peterson to kill Perrin or that they talked about killing Perrin.

Still another account came from Jennings's cellmate, Samantha White, who claimed Jennings told her "pretty much everything" about the murder. White testified that Jennings told her that Jennings "hyped [Peterson] up about [Jennings] being molested as a child" and Peterson was "angry about somebody[] molesting [Jennings] when she was younger and touching her in inappropriate ways." Jennings also told White that "they had joked about it before, about killing [Perrin], but up until that night . . . she didn't think that they meant it."

Street testified that on the night of Perrin's murder he "texted [Jennings] to see what was going on." Specifically, Street sent Jennings a message via Facebook that asked whether Peterson was "still doing it," which Street explained meant whether "they were going to strangle or smother [Perrin] in his sleep." Jennings responded, "No texting."

5

That evening, Peterson obtained Perrin's gun from Perrin's bedroom. Jennings said she was asleep when this happened but she remembered waking up at some point, seeing Peterson "playing with [Perrin's] gun," "cuss[ing] him out," and falling back asleep. Street, however, testified that when Peterson was checking the gun to make sure it was loaded, they were in Jennings's bedroom, and she was present and "on her phone."

Peterson went into Perrin's bedroom and shot him "until the gun was empty." Jennings testified that she was awoken by the sound of four or five gunshots, but she said that when Peterson came into her room and told her that he shot Perrin, she thought he was joking and she went back to sleep. Peterson, likewise, testified that Jennings had "no clue" he was going to shoot Perrin.

After the shooting, Peterson took the gun apart and burned the stock of the gun in a barrel in Perrin's backyard before wrapping Perrin's body in his mattress cover. Jennings testified that she woke up and saw Peterson wrapping Perrin's body, at which point she realized the murder had occurred. Jennings testified that she did

6

not call 911 because Peterson threatened her. Instead, she drove Peterson to his relative's property on Wahatchee Creek Road, where he hid the rest of the gun underneath a house on the property. Jennings then drove Peterson to work. A short time later, Peterson called Jennings and asked to be picked up. Jennings picked up Peterson from work and brought him back to Perrin's house, where they both spent the night.

The next day, Peterson dragged Perrin's body outside and placed it in the trunk of Perrin's car. Peterson and Street drove to the property on Wahatchee Creek Road, and Peterson dumped Perrin's body into a pond on the property. Peterson then told Jennings and Street "to come up with a plan." Jennings decided to fabricate a story that Perrin left the house for a car transmission and did not come back. Peterson spent the night at Perrin's house, and Jennings drove him home the next day. Several days later, Peterson told a cousin, "Me and [Jennings] killed her grandpa."

Approximately four days after Perrin's murder, on January 7, Jennings and Street went to the Elbert County Sheriff's Office (the

"ECSO") and reported Perrin missing, stating that he went "to get a transmission, and he never came back." A deputy told them to return the next morning if Perrin did not come home that night.

The next morning, Jennings and Street went to the ECSO and gave written statements, stating that Perrin left home on January 4 to look for a transmission and had not come back. But later that same day, both Jennings and Street admitted that Peterson shot Perrin on the evening of January 3.

Street offered to show police where Perrin's body was located, and he directed police to the property on Wahatchee Creek Road, where Perrin's body was retrieved from a pond. After Perrin's body was recovered, Lieutenant Adam Moss obtained a search warrant and searched Perrin's house, where a .22-caliber projectile was recovered from underneath Perrin's bed.

Later that day, Peterson was arrested for Perrin's murder. Peterson initially told police that Jennings or Street killed Perrin, but he later admitted that he killed Perrin and said that Jennings offered him a red truck in exchange for killing Perrin.

8

The next day, Jennings was arrested. After she was advised of her *Miranda*[2] rights, she directed police to the abandoned house on Wahatchee Creek Road where Peterson hid Perrin's gun. From underneath the side of the house, police recovered a .22-caliber rifle, missing its wooden stock. While on the property, Jennings stated that Peterson hid the gun the night Perrin was killed, but Peterson did not dispose of Perrin's body on the property until the next day.

Lieutenant Moss recovered a cell phone belonging to Jennings from Perrin's car. Jennings's phone did not contain a contact for Peterson, and the phone's messages and call log contained no mention of Peterson.

While Jennings was in jail awaiting trial, she befriended Carlie Minervino, another inmate. Minervino testified that Jennings said she was in jail because "she had her granddaddy killed."[3] Because Minervino was going to be released soon, Jennings asked Minervino to buy a phone once she was released, download an app, and create

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).
[3] Jennings denied she told Minervino that she planned to kill Perrin.

fake text messages between Jennings and Peterson. Jennings wrote the messages to be created on a piece of paper and gave them to Minervino, who stored the paper in a Bible. Minervino, however, left the Bible (and the fabricated messages) behind when she was released from jail. After Minervino was released, Jennings repeatedly called her from jail to ask if she had created the fabricated messages. Jennings's jail phone calls were monitored by Lieutenant Moss, who got a search warrant for the Bible and found the messages. The messages generally portrayed two conversations between Jennings and Peterson, one on the evening of the murder and one a few days later, in which Peterson took responsibility for killing Perrin and Jennings expressed shock and anger that he had done so.

At trial, White, Jennings's cellmate, testified that Jennings would "go back and forth" on why she wanted Perrin dead, offering reasons that included Perrin "had touched" Jennings when she was younger, Perrin "was strict on her," and she needed money and was either a beneficiary of Perrin's life insurance policy or she would

obtain half of everything Perrin owned. Jennings testified she "didn't know [she] was a beneficiary [of Perrin's life insurance policy]" prior to Perrin's death, claiming she learned that she was a beneficiary in the discovery provided by the State. Jennings also testified that she would often write checks for Perrin, with his consent, "[l]ike if he was driving or something, he would tell [her] to write to the check for him." She further testified that sometimes Perrin would gift her money and have her write the check to herself.[4]

1. Jennings contends that the trial court abused its discretion under OCGA § 24-4-404 (b) ("Rule 404 (b)") in admitting other-acts evidence in the form of Perrin's bank records, implying that Jennings stole from Perrin. We conclude, however, that this evidence was intrinsic, and we see no abuse of discretion in its admission. See *Heade v. State,* 312 Ga. 19, 24 (3) (860 SE2d 509) (2021) ("Because the evidence was intrinsic, it was outside the reach of Rule 404 (b)." (citation and punctuation omitted)).

---

[4] The State introduced Perrin's bank records, evidencing that 14 checks were made out to Jennings from Perrin's checking account in an amount totaling over $7,000.

"'Intrinsic evidence' is defined as evidence that (1) pertains to an uncharged offense arising from the same transaction or series of transactions as the charged offense; (2) is necessary to complete the story of the crime; or (3) is inextricably intertwined with the evidence regarding the charged offense." *Abbott v. State*, 311 Ga. 478, 482 (2) (858 SE2d 696) (2021) (citation and punctuation omitted).

> [E]vidence pertaining to the chain of events explaining the context, *motive*, and set-up of the crime is properly admitted if it is linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury[.] . . . And this sort of intrinsic evidence remains admissible even if it incidentally places the defendant's character at issue.

*Heade*, 312 Ga. at 25 (3) (citation and punctuation omitted; emphasis supplied). "In assessing whether evidence is necessary in this context, we have noted that 'necessary' is not used in a strictly literal sense, but rather, refers to what evidence is reasonably necessary for the State to complete the story of the crime." *Abbott*, 311 Ga. at 483 (2) (citation and some punctuation omitted).

12

Additionally, "there is no bright-line rule regarding how close in time evidence must be to the charged offenses . . . for that evidence to be admitted properly as intrinsic evidence." *Harris v. State*, 310 Ga. 372, 381 (2) (b) (850 SE2d 77) (2020).

In this case, the evidence showed that Perrin's checking-account balance dwindled from an average monthly balance of approximately $20,000 in March 21 through July 17, 2017, to $88.05 in late December 2017, through a combination of cash withdrawals and drawn checks. From July through October, 14 checks were made out to Jennings from Perrin's checking account in an amount totaling over $7,000.[5] Jennings testified that Perrin gifted her money and allowed Jennings to write checks out of Perrin's checking account to herself. The State, however, argued that Jennings stole the money from Perrin without his knowledge or consent.

Jennings argues that the bank records did not advance the "proffered motive" that Jennings had Perrin killed because she was

---

[5] There were also multiple checks made out to another person; the State acknowledged in closing argument that "Jennings wasn't the only person who was taking advantage of Otha Perrin."

13

the beneficiary of a life insurance policy. But Jennings fails to acknowledge that the State argued Jennings's "financial motive [was] Otha Perrin's empty bank account[] and the insurance policy." During closing argument, the State argued that the bank records showed that Jennings relied on Perrin financially (whether Perrin was gifting Jennings money or Jennings was stealing from him)[6] and that Perrin "had almost no money left in his bank account" prior to his murder. The State then referenced Jennings's testimony that she was the beneficiary of Perrin's life insurance policy and argued the dual financial motives of the "empty bank account[] and the insurance policy." White testified that Jennings "would go back and forth" on why she wanted Perrin dead, but she "talked about the money, the life insurance policies, that everything would be hers and her brother's." The jury would have been authorized to infer that once Perrin's checking account was depleted in December 2017, Jennings convinced Peterson to kill Perrin in early January 2018 so

---

[6] The State argued both that Jennings "was taking advantage of" Perrin and that he was "generous" and "helped her out."

that she could obtain the proceeds of Perrin's insurance policy and also his personal and real property. In fact, Jennings admitted that she started driving Perrin's Cadillac, as opposed to her own car, after he was killed. Thus, Perrin's bank records were admissible as intrinsic evidence because the records were necessary to complete the story of the crimes and helped explain Jennings's financial motive. See *Abbott*, 311 Ga. at 483 (2) (concluding that the trial court did not abuse its discretion in classifying evidence that the defendant stole from the victim in the weeks leading up to her murder as intrinsic because it "formed part of the chronology of [the defendant's] crimes leading to the murders, offering insight into his motive"). See also *McKelvey v. State*, 311 Ga. 34, 40 (3) (855 SE2d 598) (2021) (evidence of prior crime was properly admitted as intrinsic evidence where it pertained to chain of events leading to charged crimes and helped explain the defendant's motive).

Jennings also contends that any probative value of the bank records was substantially outweighed by their prejudice and thus the records should have been excluded under OCGA § 24-4-403

15

("Rule 403"). See *State v. Harris*, 316 Ga. 272, 278 (3) (888 SE2d 50) (2023) ("Intrinsic evidence must also satisfy Rule 403." (citation and punctuation omitted)). Under Rule 403,

> [r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Id. at 278 (3). "[A]ll inculpatory evidence is inherently prejudicial; it is only when *unfair* prejudice substantially outweighs probative value that the rule permits exclusion." *Middlebrooks v. State*, 310 Ga. 748, 751 (854 SE2d 503) (2021) (citation and punctuation omitted; emphasis in original).

Here, the bank records were not unfairly prejudicial. The records themselves did not show that Jennings was stealing from Perrin. But see *Carter v. State*, 317 Ga. 689, 694 (2) (895 SE2d 295) (2023) ("The prejudicial effect of evidence is unfair if it has the capacity to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged, or an undue tendency to suggest decision on an improper basis, commonly,

16

though not necessarily, an emotional one." (citation and punctuation omitted)). In light of the high probative value of the bank records, evidencing Jennings's financial motive, we conclude that the probative value of Perrin's bank records was not substantially outweighed by the danger of unfair prejudice. See *Abbott*, 311 Ga. at 483 (2) (where the defendant's stealing from the victim "formed part of the chronology of [the defendant's] crimes leading to the murders, offering insight into his motive," probative value of that evidence was not substantially outweighed by danger of unfair prejudice). Accordingly, this claim fails.

2. Jennings contends that the trial court abused its discretion by admitting certain Facebook messages between Jennings and Street. Jennings argues the messages should have been excluded because they did not fall within the statutory hearsay exception for business records under OCGA § 24-8-803 (6) and because Facebook's declaration did not meet the standard for self-authenticating business records under OCGA § 24-9-902 (11). The messages at issue showed Street sending Jennings a message on the night of the

17

murder that said, "He still doing it," and Jennings immediately responding, "No texting." Street explained in his testimony that his message "He still doing it" was intended to ask Jennings whether Peterson was still planning to kill Perrin that night, as they had previously discussed.

Jennings failed to object on these grounds at trial, so we review the admission of these records for plain error only.[7] See *Stafford v. State*, 312 Ga. 811, 820 (3) (b) (865 SE2d 116) (2021) ("Because [the defendant] did not make a specific objection at trial to the admission of the statements on the grounds now asserted in his appeal, we review these claims only for plain error." (citation and punctuation omitted)).

"To show plain error, an appellant must show that (1) the alleged error was not affirmatively waived, (2) it was obvious beyond reasonable dispute, and (3) it affected the appellant's substantial

---

[7] Prior to trial, Jennings objected to the presentation of the Facebook records only on the basis that presenting the business records without a witness violated her substantive due process rights under the United States and Georgia Constitutions. She made no objection concerning OCGA §§ 24-8-803 (6) or 24-9-902.

rights, which ordinarily means showing that it affected the outcome of the trial." *Jackson v. State*, 317 Ga. 95, 106 (891 SE2d 866) (2023) (citation and punctuation omitted). "This Court does not have to analyze all elements of the plain-error test where an appellant fails to establish one of them." *Rutland v. State*, 315 Ga. 521, 524 (883 SE2d 730) (2023). Pretermitting whether the trial court erred in admitting the Facebook records, we conclude that Jennings has failed to satisfy the third prong of the plain-error analysis, requiring her "to make an affirmative showing that the error probably did affect the outcome below." *Ruthenberg v. State*, 317 Ga. 227, 231 (2) (892 SE2d 728) (2023).

The other evidence introduced at trial included Jennings testifying that she had twice "discussed wanting [Perrin] dead" to Peterson. She further testified that Peterson told her that "if somebody ever F'd with [her], then he would kill them" and that Jennings told Peterson that Perrin "was touching on [her]." She also admitted that when she told Peterson that she wanted Perrin to die, Peterson responded, "I got you." A week later, she picked Peterson

19

up from his home and brought him to Perrin's house, and Peterson killed Perrin that evening. Peterson testified that he did not know why he killed Perrin, but he admitted that he told police that Jennings "offered" him a "red truck" to kill Perrin.

Jennings testified that, after Peterson killed Perrin, she drove Peterson to the abandoned house where he disposed of the gun and then drove him to work. Approximately three days after Perrin was killed, Peterson told his cousin, "Me and [Jennings] killed her grandpa. We shot him, like, seven times."

After Jennings was arrested, she shared a cell with White, who testified that Jennings told her that Jennings "hyped [Peterson] up about being molested as a child" before Peterson shot Perrin. White also stated that Jennings explained that she, Peterson, and Street wrapped up Perrin's body and dumped it in a pond. Additionally, Jennings attempted to convince another inmate at the jail to manufacture messages between Jennings and Peterson to make it appear as though she did not want Perrin dead.

Given the other strong evidence at trial, Jennings cannot show

that the introduction of the Facebook messages (Exhibits 70 and 71) between her and Street likely affected the outcome of the trial court proceedings, particularly since Street testified about the content of the messages. Thus, Jennings cannot satisfy the third prong of the plain-error test, and this claim fails. See *Williams v. State*, 316 Ga. 304, 314 (4) (888 SE2d 60) (2023) (any error in admitting hearsay was harmless given the strength of the evidence identifying and inculpating the defendant and the cumulative nature of the hearsay testimony).

3. Jennings contends that her counsel provided constitutionally ineffective assistance by (a) failing to preserve her objection to Perrin's bank records, (b) failing to preserve her objection to the Facebook records, and (c) failing to (i) preserve an objection to the exclusion of her domestic-violence expert and (ii) failing to timely disclose her expert.

To prevail on claims of ineffective assistance of counsel, Jennings must demonstrate both that her trial counsel's performance was professionally deficient and that she was

21

prejudiced by this deficient performance. See *Bates v. State*, 313 Ga. 57, 62 (2) (867 SE2d 140) (2022) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984)). To establish deficient performance, Jennings must show that trial counsel performed her duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. Establishing deficient performance

> is no easy showing, as the law recognizes a strong presumption that counsel performed reasonably, and [the appellant] bears the burden of overcoming this presumption. To carry this burden, he must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not. In particular, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.

*Park v. State*, 314 Ga. 733, 740-741 (879 SE2d 400) (2022) (citation and punctuation omitted). To establish prejudice, Jennings must prove that there is a reasonable probability that, but for her trial counsel's deficiency, the result of the trial would have been different. See *Bates*, 313 Ga. at 62 (2). "A reasonable probability is a

22

probability sufficient to undermine confidence in the outcome." Id. (citation and punctuation omitted). "And, this burden is a heavy one." Id. at 62-63 (2) (citation and punctuation omitted). "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Taylor v. State*, 315 Ga. 630, 647 (5) (b) (884 SE2d 346) (2023) (citation and punctuation omitted).

(a) Jennings contends that her counsel provided constitutionally ineffective assistance by failing to preserve her objection to the admission of Perrin's bank records. But Jennings also argues that "[t]rial counsel appears to have preserved objections to . . . [Perrin's bank records] . . . so as to receive merits review." We agree that counsel preserved her objection to the introduction of Perrin's bank records by objecting at trial, and we have reviewed Jennings's enumeration of error pertaining to the admission of those records in Division 1 (a). Thus, we conclude that counsel was not deficient, and this claim fails. See *Salvesen v. State*, 317 Ga. 314, 321 (4) (893 SE2d 66) (2023) (rejecting ineffective assistance claim

23

based on purported failure to preserve errors where trial counsel properly preserved his argument by making a timely objection below).

(b) Jennings contends that her trial counsel provided constitutionally ineffective assistance by failing to preserve her objection to the Facebook records between Jennings and Street. Pretermitting whether counsel performed deficiently,[8] we conclude that Jennings cannot show prejudice. "Again, to prove prejudice, [a defendant] is required to show that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ingram v. State*, 316 Ga. 196, 205 (1) (a) (887 SE2d 269) (2023) (citation and punctuation omitted).

"The prejudice step of the plain-error standard is equivalent to the prejudice prong for an ineffective assistance of counsel claim." *Bozzie v. State*, 302 Ga. 704, 711 (4) (b) (808 SE2d 671) (2017). As explained in Division 2, there was strong inculpatory evidence

---

[8] As explained in Division 2, trial counsel preserved an objection to the Facebook records, but not on the grounds asserted on appeal.

admitted at trial and Street testified about the contents of the Facebook messages. Thus, Jennings cannot show a reasonable likelihood that the result of her trial would have been different had counsel preserved an objection to the Facebook records under OCGA §§ 24-8-803 (6) and 24-9-902 (11). Accordingly, this claim fails. See *Ingram*, 316 Ga. at 205-206 (1) (a) (concluding that trial counsel's failure to object was harmless in light of the strong evidence of guilt).

(c) Jennings contends that her counsel provided constitutionally ineffective assistance by (i) failing to preserve her objection to the exclusion of her domestic-violence expert and (ii) failing to timely disclose her expert under OCGA § 17-16-4. We conclude that Jennings preserved her objection to the exclusion of her expert and that the claim for failing to timely disclose the expert fails because Jennings cannot establish prejudice.

At trial, Jennings called Lieutenant Derek Scott with the Athens-Clarke County Police Department to testify and asked whether "as part of [his] training and experience," he "learned about what's known as the cycle of violence." The State objected, and

25

Lieutenant Scott was questioned outside the presence of the jury, testifying that he had no firsthand knowledge of the details of the case. The State then argued that Jennings was attempting to present an expert without providing notice under OCGA § 17-16-4 and that, if Lieutenant Scott was not an expert witness, his testimony was inadmissible "because a lay witness cannot testify to an opinion unless it relates to facts of the case that they have firsthand knowledge of." The trial court ultimately excluded Lieutenant Scott's testimony, citing *Virger v. State*, 305 Ga. 281 (824 SE2d 346) (2019), for the proposition that "this [C]ourt has consistently upheld the exclusion of evidence of a defendant's diminished mental condition when offered to support other defenses or to negate the intent element of a crime." Jennings's trial counsel objected to the trial court's ruling, and the court permitted counsel to proffer Lieutenant Scott's testimony on the record for the limited purpose of preserving the objection on appeal.

Regarding the delayed reporting of sexual abuse, Lieutenant Scott's proffered testimony was that:

> With sex crimes, generally when it's like kids involved, they don't want to talk about it because, first of all, they don't think that anybody's going to believe them. It's pretty hard to say that, you know, a father-type figure, a mother-type figure that everybody respects in the family is doing something that's evil to somebody. So there's a lot of fear with that, or they have made comments about it, and they're just rejected. So then they just – They withhold it. There's many reasons, but a lot of it is just about manipulation and control.

He also said that people sometimes delay reporting sexual abuse "because they fear that the loss of . . . financial resource[s] would occur." Specifically for "a child that's been raised by [a] grandparent . . . everything is supplied to them by their parent or grandparent, so depending on their ages, they don't see that there's an outlet. They don't see that there's an opportunity to go anywhere else because that's all they know." After Lieutenant Scott testified, the trial court reiterated that its ruling was based on *Virger*, and counsel maintained her objection.

In its order denying the motion for new trial, the trial court found that Jennings called Lieutenant Scott as an expert and that she failed to provide the State with a summary of his opinion at least

27

five days prior to trial in accordance with OCGA § 17-16-4. The trial court concluded that Jennings failed to comply with OCGA § 17-16-4, a different basis entirely from its ruling at trial, and that Lieutenant Scott's testimony was properly excluded. The trial court also concluded that trial counsel preserved any objection relating to the exclusion of Lieutenant Scott's testimony.[9]

(i) Jennings contends that her trial counsel performed deficiently by failing to preserve her objection to the exclusion of Lieutenant Scott's testimony, but as shown above, Jennings preserved her objection. Thus, we conclude that counsel did not perform deficiently. See *Salvesen*, 317 Ga. at 321 (4).

(ii) Pretermitting whether Jennings's trial counsel performed deficiently by failing to comply with OCGA § 17-16-4 by providing notice of her expert, we conclude that Jennings has failed to establish prejudice. To establish prejudice, Jennings must show that there is "a reasonable probability that the expert's testimony would

---

[9] In its order, the trial court "[f]ound that . . . trial counsel did preserve all of the foregoing errors," but did not make any specific findings regarding the exclusion of Lieutenant Scott's testimony.

28

have made a difference [at] trial." See *Parker v. State*, 305 Ga. 136, 141 (4) (a) (823 SE2d 313) (2019).

Jennings argues Lieutenant Scott's testimony was admissible because it "would have been offered to explain why . . . Jennings might have delayed [the] reporting [of] sexual abuse [by Perrin], which went to her credibility on the stand." But even assuming that Lieutenant Scott's testimony was admissible on this point (and that the jury believed that Jennings delayed reporting Perrin's sexual abuse), Lieutenant Scott's testimony would not have been helpful to Jennings since it provided her with a strong motive to want Perrin dead, i.e., Perrin had molested her. This sexual-abuse motive, although not the motive advanced by the State, was weaved throughout the evidence introduced at trial through Jennings's testimony that Perrin "was touching on her," Peterson's testimony that Jennings told him that she had been molested, and White's testimony that Jennings said she "hyped [Peterson] up about [Jennings] being molested as a child," impliedly to get Peterson to shoot Perrin. Because Lieutenant Scott's testimony would have

29

supported the theory that Jennings convinced Peterson to kill Perrin because he had molested her, Jennings cannot show that there is a reasonable probability that Lieutenant Scott's testimony would have made a difference in the outcome of her trial. See *Richardson-Bethea v. State*, 301 Ga. 859, 865 (2) (804 SE2d 372) (2017) (explaining that the standard is "whether there is a *reasonable probability* that the result of the trial would have been different had trial counsel presented the proffered evidence," not whether an expert's proffered testimony "*might* conceivably have created some doubt in the mind of a juror") (emphasis in original). Accordingly, this claim fails.

4. Finally, Jennings contends that the combined prejudicial effect of trial court errors and trial counsel's deficiencies affected the outcome of the trial. See *State v. Lane*, 308 Ga. 10, 17 (1) (838 SE2d 808) (2020). To establish cumulative prejudice that warrants a new trial, Jennings must show that "at least two errors were committed in the course of the trial; and considered together along with the entire record, the multiple errors so infected the jury's deliberation

30

that they denied [the defendant] a fundamentally fair trial." *Talley v. State*, 314 Ga. 153, 166 (4) (875 SE2d 789) (2022).

For the purposes of this analysis, we are assuming trial court error in Division 2 (admission of the Facebook records), and we have assumed the deficient performance of counsel in Divisions 3 (b) (failure to preserve a certain objection to the admission of the Facebook records) and 3 (c) (ii) (failure to provide notice of the domestic-violence expert). As discussed above, the evidence against Jennings was strong, and the admission of the Facebook records and the exclusion of the domestic-violence expert were unlikely to have affected the outcome of the trial because Street testified that he sent the Facebook messages to Jennings (and explained the messages' meaning) and the expert's proffered testimony supported a motive for Jennings wanting to kill Perrin. We note that Perrin's bank records also supported a motive for Jennings wanting Perrin dead, and this motive was unrelated to any sexual misconduct by Perrin. Accordingly, assuming we can combine the assumed evidentiary error with trial counsel's assumed deficiencies, we conclude that the

31

combined prejudicial effect did not deprive Jennings of her right to a fundamentally fair trial. See *Lofton v. State*, 309 Ga. 349, 367 (7) (846 SE2d 57) (2020) (concluding that the "cumulative prejudicial effect of the actual and assumed evidentiary errors and counsel's deficiencies is not sufficient to outweigh the stregth of the properly admitted evidence of [the defendant's] guilt").

*Judgment affirmed. All Justices concur.*