

SUPREME COURT OF GEORGIA

November 2, 2022

The Honorable Supreme Court met pursuant to adjournment.

The following order was passed:

Upon consideration, the Court has revised the deadline for motions for reconsideration in this matter. It is ordered that a motion for reconsideration, if any, including motions submitted via the Court's electronic filing system, must be **received in the Clerk's Office by 2 p.m. on Wednesday, November 9, 2022**.

**SUPREME COURT OF THE STATE OF GEORGIA**
Clerk's Office, Atlanta

I certify that the above is a true extract from the minutes of the Supreme Court of Georgia.
Witness my signature and the seal of said court hereto affixed the day and year last above written.

_____ , Clerk

NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: November 2, 2022

S22A0420.  ROBERTS v. THE STATE.

PINSON, Justice.

Melvin Roberts was convicted of malice murder and other crimes in connection with the shooting death of Jabari Pettway.[1] On appeal, Roberts contends that the trial court erred in admitting evidence of an armed robbery he allegedly committed nine days

---

[1] The crimes were committed on November 1, 2016. Roberts was indicted by a Gwinnett County grand jury on February 1, 2017 on one count each of malice murder, felony murder, aggravated assault, and theft by taking. Roberts was tried before a jury in May 2018. After the close of the State's evidence, the trial court granted a directed verdict as to felony-level theft by taking because the State had failed to prove the value of the object of the theft—Pettway's car—and that count was converted to a misdemeanor. At the conclusion of trial, the jury found Roberts guilty on all counts. On May 23, 2018, Roberts was sentenced to life in prison without the possibility of parole for the malice murder, plus a concurrent 12-month term for the misdemeanor theft by taking. The felony murder was vacated by operation of law, and the aggravated assault merged into the malice murder. Roberts filed a timely motion for new trial on May 25, 2018, which he amended in March and April of 2021. The parties agreed to proceed on the motion without a hearing, and the motion was denied on September 14, 2021. That same day, Roberts filed his notice of appeal. The appeal was thereafter docketed to the April 2022 term of this Court and was submitted for a decision on the briefs.

1

before the murder. That evidence included a shell casing that testing showed was discharged from the same gun as casings from Pettway's murder, as well as testimony from the armed-robbery victim identifying Roberts as the one who possessed, shot, and left with the gun. The trial court admitted all of the armed-robbery evidence under OCGA § 24-4-404 (b) ("Rule 404 (b)") for the purpose of proving Roberts's identity as the murderer.

We affirm on a different legal basis. A limited portion of the physical evidence and testimony from the armed robbery placed the murder weapon in Roberts's hands just nine days before Pettway's murder. That limited evidence was not subject to Rule 404 (b) because it was admissible as evidence intrinsic to the charged crime. The same cannot be said for the armed-robbery evidence as a whole, but any error in admitting evidence of the robbery beyond the intrinsic portion was harmless, because the evidence against Roberts that was properly admitted was quite strong, and the court's limiting instruction about the armed-robbery evidence mitigated the chance that the jury considered the extraneous details of the

2

robbery.

1. *Facts*

(a) Around 7:30 p.m. on November 1, 2016, 23-year-old Jabari Pettway left the Duluth apartment he shared with his brother, Marqueze Marshall, in his 2012 silver Dodge Avenger. Marshall testified that his brother was going to meet a friend and that he left carrying a red book bag, along with his wallet and cell phone. Later that evening, around 9:55 p.m., Pettway called Marshall to tell him he was on his way home. But Pettway never made it home. The next morning, after trying to reach Pettway, Marshall called their mother, Casandra Mosley, to let her know Pettway was missing.

Mosley testified that Marshall called her around noon on November 2 and told her that Pettway had not come home the night before and had not shown up for work or school that day. After calling local hospitals, Mosley called Pettway's cell phone carrier and got a list of Pettway's recent calls. Mosley and Pettway's sister, Renee Hunter, started calling the numbers on the list, and both eventually spoke to Roberts, whom Pettway had known in high

3

school. Roberts told both Mosley and Hunter that he had seen Pettway the evening before, that Pettway had planned to return to Roberts's home later that night but never did, and that he had not been able to reach Pettway. Later that day, Roberts texted both Mosley and Hunter to say he was "praying for" them.

In the meantime, Gwinnett County police had been called to respond around 8:00 a.m. that morning after the body of an unidentified male was discovered in Snellville on the edge of a Gwinnett County farm abutting Lenora Road. The man was dead, having been shot multiple times in the back. At the scene, investigators recovered five .40-caliber shell casings and two cigarette butts. The cigarette butts were distinctive because they had been smoked past the filter. The victim's left front pants pocket was pulled out, and no car keys, wallet, or cell phone were found at the scene.

The victim of the shooting was later identified as Pettway. The medical examiner testified that he had suffered five gunshot wounds, one to the arm and four to the back, and opined that the

4

manner of death was homicide.

Witness Jimmy Beaver testified that late in the evening on November 1, he was watching the World Series on television at his Snellville home on Lenora Road when he heard a car drive past, heading in the direction of where the paved road turned to gravel. A few minutes later, he heard a single gunshot, followed by a one- to two-second pause, and then four rapid-fire shots. About two minutes after that, he heard a car speed back up the gravel road, hit the pavement, and drive away.

Based on Beaver's report that the shots were fired during the sixth inning of the World Series game, the lead investigator in the case, Corporal Shannon Kulnis, determined that the shooting had occurred between 10:00 and 10:30 p.m. Investigators became interested in Roberts because of his apparent interactions with Pettway just before the murder. Cell-tower records indicated that a phone call Pettway placed at 9:49 p.m. "pinged" from the same cell tower as a call Roberts placed at 9:38 p.m., indicating that they were together shortly before the murder. This cell tower was near the site

5

where Pettway's body was found.

Corporal Kulnis determined that Roberts had an outstanding arrest warrant. After using cell-tower records to locate Roberts, police made a traffic stop, took him into custody, and confiscated his cell phone. An inventory search of his car turned up boxes of Newport cigarettes and a Samsung Galaxy cell-phone box.

(b) At the police station, Roberts waived his rights under *Miranda*[2] and agreed to speak with investigators. In the video-recorded interview, Roberts admitted that he had been with Pettway earlier on the night of the murder, but he denied any involvement in the shooting. He admitted that he and Pettway had been intermittent sexual partners over the previous two years. On the evening of the murder, Roberts said, Pettway had come to his home in Lawrenceville, where they "did sexual things." They then left to buy cigarettes, and after that, Roberts said, they parted ways. Roberts said he had expected Pettway to return later that evening, but Pettway never showed up.

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

Cell-tower records showed Roberts's and Pettway's phones pinging off the same tower near Roberts's Lawrenceville apartment at 7:29 p.m. and at various times until 9:21 p.m. Surveillance video from a Citgo gas station in Lawrenceville showed the pair arriving there at 9:17 p.m., Roberts in his blue Hyundai Sonata and Pettway in his silver Dodge Avenger. The video showed Roberts buying Newport cigarettes and the men then leaving, each in his own car, at 9:21 p.m., both heading in the direction of Snellville.

In his interview, Roberts first told the investigators that after returning from the cigarette run, he had stayed at home the entire evening. He also said he had his cell phone with him at all times that night. Investigators then confronted him with evidence showing that, after the time of the cigarette purchase, both his phone and Pettway's phone were in close proximity, near the crime scene. At that point, Roberts claimed he had been at his grandmother's home, which was near the crime scene. He explained his earlier dishonesty about his whereabouts by saying he just "didn't want to get [himself] involved" in the investigation.

(c) A forensic examination of Roberts's cell phone showed that Pettway's phone number was listed in Roberts's contacts. Also listed in Roberts's contacts was a phone number for a person designated as "Bro"; this number matched the number to which numerous outgoing calls were made from Roberts's phone on the night of November 1 and thereafter, through the early morning hours of November 3. The first of these calls was placed at 10:17 p.m., from a location near the crime scene. The call recipient was determined to be Dawan Glover, who later testified for the State under an immunity agreement.

Glover testified that Roberts called him late in the evening on November 1 and asked to come see him. At the time, Glover was at his girlfriend's home in the Allen Hill apartment complex in southwest Atlanta. Glover agreed, and Roberts drove to Allen Hill, where he met Glover in the parking lot. Roberts told Glover he was "trying to get rid of his car" and offered to pay Glover to help; Glover agreed. Glover testified that he believed there was "an insurance situation" and that Roberts was "just doing it for the money."

Glover testified that Roberts wiped down the inside of the car with cleaning solution, and the pair then left Allen Hill, Glover driving his girlfriend's Chevy Lumina and Roberts following behind. They drove to a gas station, where Glover filled an antifreeze jug with gasoline. The pair then drove to an abandoned lot off of Chappell Road, in the Bankhead area. Glover doused the car with gasoline, lit a T-shirt on fire, and threw the T-shirt inside the car. Once the car began smoking, they drove off in Glover's girlfriend's car and returned to Allen Hill, where Roberts stayed the night. Not sure whether their plan to destroy the car had worked, the pair returned to the Bankhead lot the next evening with more gasoline and, finding the car still intact, successfully set it ablaze.

Glover's girlfriend, Quaneshia Cleckley, also testified for the State. She testified that, late on the night of November 1, Glover asked to borrow her car, and she saw Glover leave the apartments with a man—whom she identified at trial as Roberts—following in a different car. When they returned about 30 minutes later, Glover asked if Roberts could stay the night, and she agreed. She recalled

9

that Roberts had with him a red or pinkish book bag, which he kept close to him while he slept, "[l]ike, if he wanted to get up and run, he was grabbing that book bag and everything was going with him." Glover, too, testified that Roberts was in possession of a red "backpack bag."

(d) Investigators discovered that Roberts's car had a GPS tracking device that had been installed by a lienholder. They got the GPS records, which showed the car's location approximately every 24 hours. The records showed that, at 1:33 a.m. on November 2, the car was located less than a mile from the crime scene, and at 2:33 a.m. on November 3, the car was in the area around Allen Hill.

The GPS tracking records, together with cell-tower records showing that Roberts had traveled from the area around the crime scene to the area around Allen Hill, led investigators to obtain surveillance-video footage from the night of the murder from the Allen Hill apartments. That recording shows a silver Dodge Avenger pulling into the complex at 11:11 p.m. Cell-phone and tower records show Roberts's phone placing calls in that vicinity at 11:10 and 11:14

p.m., the latter call being placed to Glover's number. The Allen Hill video shows the Dodge Avenger and Cleckley's Chevy Lumina leaving the complex at 11:53 p.m. Cell-tower records show Roberts's phone in the vicinity of the Bankhead lot at 1:58 a.m. on November 2; by 2:12 a.m., the phone was back in the vicinity of Allen Hill. Surveillance video shows the Chevy Lumina returning to the apartment complex at 2:12 a.m., this time with a passenger wearing the same clothes Roberts was wearing in the Citgo surveillance video.

The Allen Hill surveillance video and cell-phone and tower records also corroborated Glover's account of the events of the subsequent day and night. The cell records reflect that Roberts placed calls to Glover on the afternoon and evening of November 2, into the early hours of November 3, and that Roberts's phone was in the area of Allen Hill on November 3 around 2:30 a.m. The video shows Roberts arriving at Allen Hill around 2:30 a.m. on November 3 in his blue Hyundai Sonata and Glover getting in the car.

On November 3 at around 4:30 a.m., firefighters responded to

11

a fire reported near Chappell Road in Atlanta and discovered the burned shell of a car, which was later identified as Pettway's.

Despite the evidence of his contacts with Glover, Roberts insisted in a second custodial interview that he did not know Glover and, when confronted with the cell records and other evidence, he claimed this evidence was all "a lie."

An examination of Pettway's phone records revealed a series of phone calls to Pettway on the evening of November 1 from a "Pinger account," an online application that can be used to place phone calls anonymously, from a "ghost number," which looks like a legitimate phone number but is not the actual number from which the call is placed. Records obtained from Pinger showed that the subscriber on the account was Roberts, who had created the account at 6:55 p.m. on November 1—52 seconds before the first call was placed to Pettway.

DNA testing on the two cigarette butts recovered from the crime scene showed that one had DNA consistent with that of Pettway, while the other had DNA consistent with that of Roberts.

(e) The State also presented evidence of Roberts's commission of a prior crime, which the trial court admitted solely for the purpose of proving identity.[3] Witness Monica Mendoza testified that on October 23, 2016, Roberts attacked and robbed her at gunpoint after the two had engaged in a brief sexual encounter. Mendoza testified that she had connected with Roberts on a dating app. On the night in question, he contacted her and arranged to come to her DeKalb County apartment. Shortly after he arrived, the two began a sexual encounter, which she stopped after Roberts tried to have intercourse without a condom. At that point, she believed he was preparing to leave, but when she turned away, Roberts put a gun to her head and told her he was not leaving without the money in the house. They struggled, and Roberts hit Mendoza with the gun and began choking her. The gun discharged, and the bullet grazed her head. The gunshot prompted a neighbor to knock on her door. Roberts fled, but he grabbed Mendoza's cell phone instead of his, leaving his at her

---

[3] Both before this evidence was presented and in its instructions after the close of all the evidence, the trial court instructed the jury that this evidence was to be considered only for the purpose of establishing identity.

13

apartment. The responding police officer, DeKalb County police detective J. W. Kim, observed furniture in disarray and blood stains in the apartment, and he recovered a single .40-caliber shell casing from the apartment floor. He later visited Mendoza in the hospital and observed her injuries.

Although Mendoza did not know who Roberts was at that time and could offer police only a description of her attacker, she saw a social-media post about Pettway's murder the next week and immediately recognized Roberts, who was pictured in the post, as her assailant. She told Detective Kim.

Detective Kim contacted Corporal Kulnis with this information. Through her investigation, Corporal Kulnis had learned that Roberts had pawned a cell phone on October 28, 2016, and this cell phone was ultimately determined to have been Mendoza's. Further investigation showed that the cell phone Roberts was using at the time of Pettway's murder had been activated on October 24, 2016—one day after the attack in which Roberts had left his phone behind.

The shell casing recovered from Mendoza's apartment was sent for forensic testing along with the five .40-caliber shell casings from the site where Pettway's body was found. A GBI firearms examiner testified that his testing showed that all six had all been fired from the same Smith & Wesson .40-caliber pistol.

2. *Analysis*

In his only enumeration of error, Roberts contends that the trial court erred by allowing the State to introduce evidence of the armed robbery of Mendoza. The trial court allowed the State to introduce that evidence under OCGA § 24-4-404 (b) ("Rule 404 (b)") to establish Roberts's identity as the person who shot Pettway; Roberts argues that the armed robbery was not similar enough to the murder to qualify as evidence relevant to showing identity under Rule 404 (b). We review the trial court's decision to admit this evidence for an abuse of discretion. *Smith v. State*, 307 Ga. 263, 270 (2) (c) (834 SE2d 1) (2019).

(a) Rule 404 (b) places specific limits on admitting "evidence of . . . other crimes, wrongs, or acts." Evidence of a defendant's past

wrongdoing is treated with caution because it can lead the jury to find the defendant guilty based on his past wrongs rather than the strength of the evidence that he committed the crime at hand. See generally *State v. Jones*, 297 Ga. 156, 159 (2) (773 SE2d 170) (2015) (noting that evidence of a defendant's other bad acts cannot be admitted simply to show bad character or propensity to commit crimes). So, before evidence of other acts is admitted, the State has to show that the other act helps prove something other than the defendant's character or propensity for wrongdoing, like "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." OCGA § 24-4-404 (b).

But Rule 404 (b) applies only to "evidence of . . . *other* crimes, wrongs, or acts": in other words, evidence that is *extrinsic* to the charged crime. Id. (emphasis added). "The limitations and prohibition on 'other acts' evidence set out in OCGA § 24-4-404 (b) do not apply to 'intrinsic evidence.'" *Williams v. State*, 302 Ga. 474, 485 (IV) (d) (807 SE2d 350) (2017) (footnote omitted)). See also *Harris v. State*, 314 Ga. 238, 264 (3) (a) (875 SE2d 659) (2022) ("Rule 404 (b)

16

is not applicable to 'intrinsic evidence.'").

The line between extrinsic and intrinsic evidence is not always a bright one, see *Harris v. State*, 310 Ga. 372, 381 (2) (b) (850 SE2d 77) (2020), and courts have drawn that line using a number of different (and sometimes overlapping) phrases meant to distinguish "direct evidence of the charged crime" from evidence of *other* crimes subject to Rule 404 (b). *United States v. Shea*, 159 F3d 37, 39 (1st Cir. 1998). See also *United States v. Roberts*, 933 F2d 517, 520 (7th Cir. 1991) (describing intrinsic evidence as "directly relevant to the crimes with which [the defendant] was charged").[4] To this end, we have said that evidence is considered intrinsic to the charged offense when it is "(1) an uncharged offense arising from the same transaction or series of transactions as the charged offense; (2) necessary to complete the story of the crime; or (3) inextricably

---

[4] As we have said before, we are guided by decisions of the federal appellate courts, and the Eleventh Circuit in particular, when applying provisions of our Evidence Code that are modeled after the Federal Rules of Evidence. See *Olds v. State*, 299 Ga. 65, 69 (2) (786 SE2d 633) (2016). Accord *Harris*, 314 Ga. at 264 (3) (a) (noting applicability of federal precedent in determining whether other-acts evidence is admissible either as intrinsic evidence or under Rule 404 (b)).

17

intertwined with the evidence regarding the charged offense." *Johnson v. State*, 312 Ga. 481, 491 (4) (863 SE2d 137) (2021) (punctuation omitted). Accord *Williams*, 302 Ga. at 485 (IV) (d) (citing *United States v. Edouard*, 485 F3d 1324, 1344 (11th Cir. 2007)). And in applying this language, we have also said that "evidence pertaining to the chain of events explaining the context, motive, and set-up of the crime is properly admitted if it is linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story for the jury." Id. (cleaned up). See also *United States v. Fortenberry*, 971 F2d 717, 721 (11th Cir. 1992) (describing intrinsic evidence as "an integral part of the circumstances surrounding Fortenberry's illegal possession of the shotgun"); *United States v. Battle*, 774 F3d 504, 511 (8th Cir. 2014) ("When evidence of other crimes tends logically to prove any element of the crime charged, it is admissible as an integral part of the immediate context of the crime charged and is not extrinsic and therefore is not governed by Rule 404 (b)." (cleaned up)).

(b)  Here, the armed robbery of Mendoza, *as a whole*, does not fall on the intrinsic side of the line. The robbery of Mendoza itself was not related to Pettway's murder in any of the ways we have said make a past crime intrinsic: that crime as a whole was neither a part of a series of transactions related to that charged crime, nor part of the story of that crime, nor "inextricably intertwined with the evidence" of it. Indeed, many of the details of the armed robbery are simply irrelevant to Pettway's murder.

But a limited portion of the evidence of the armed robbery is properly considered intrinsic. See *Battle*, 774 F3d at 512 (noting that "limited evidence" about prior crime committed with the same gun—including ballistics evidence and testimony identifying defendant as shooter—was intrinsic); *Roberts*, 933 F2d at 519-20 (affirming admission of evidence about police chase after crime committed two days after charged offenses, in which officers seized from defendant the weapon used in the charged offenses; although the later crime was not intrinsic and was properly excluded, the "cautiously edited testimony regarding the government's recovery of [the] gun" was

19

intrinsic). The evidence from that incident included a .40-caliber shell casing that testing showed was discharged from the same gun as the casings from the scene of Pettway's murder, and testimony that Roberts possessed and shot that gun during the incident. This physical evidence and testimony directly placing the murder weapon in Roberts's hands in the days leading up to Pettway's murder was "reasonably necessary to complete the story" of that charged crime. See, e.g., *Heade v. State*, 312 Ga. 19, 24-26 (3) (860 SE2d 509) (2021) (evidence of three incidents leading up to charged crimes was "reasonably necessary to complete the story" because it explained the relationship between the parties and the defendant's motive in committing the charged crimes); *Abbott v. State*, 311 Ga. 478, 483 (2) (858 SE2d 696) (2021) (evidence of prior theft was intrinsic when it "offer[ed] insight into [defendant's] motive" and "provid[ed] evidence of premeditation" as to charged crimes); *Smith*, 307 Ga. at 272 (2) (c) (witness's testimony about prior drug dealing by defendants was necessary to complete the story of the crime because it explained how the witness was able to identify the defendants and

20

also advanced the State's theory of the case). See also *United States v. Fortenberry*, 971 F2d 717, 719-21 (11th Cir. 1992) (evidence of defendant's involvement in a prior double murder was admissible as to charge of unlawful firearm possession where the possession charge involved the weapon used in the murders); *Battle*, 774 F3d at 511 (in prosecution for unlawful firearm possession where gun was discovered on the floor of a car occupied by defendant and two others, concluding that evidence of prior crime committed by defendant with same gun was intrinsic evidence that established defendant's constructive possession); *United States v. Brooks*, 715 F3d 1069, 1076-77 (8th Cir. 2013) (photos and video showing defendant posing with a gun, recovered from cell phone left in stolen van, were intrinsic where gun appeared to be the same gun used in stealing the van and committing armed robbery earlier that same day); *Shea*, 159 F3d at 39-40 (gun seized during defendant's arrest for a separate crime one week after the charged crime was admissible as intrinsic evidence where government sought to prove it was the same gun used in charged crime); *Roberts*, 933 F.2d at 520

21

(categorizing as intrinsic the limited evidence that defendant "was caught with a dark steel revolver with a brown handle matching the description of the weapon he used only two days earlier to rob the Joliet bank" because it was "directly relevant to the crimes with which he was charged"); *United States v. Towne*, 870 F2d 880, 886 (2d Cir. 1989) (in prosecution for unlawful receiving and possession of a firearm, evidence that defendant was in possession of that firearm on dates not charged in the indictment was admissible as intrinsic evidence).

As intrinsic evidence, this limited evidence from the armed robbery was admissible as long as it satisfied OCGA § 24-4-403 ("Rule 403"), see *Harris*, 314 Ga. at 264 (intrinsic evidence "'must satisfy Rule 403'"), and there is little question that it did. Physical evidence and testimony placing the murder weapon in Roberts's hands just nine days before the murder had substantial probative value, particularly given the lack of eyewitnesses to Pettway's murder and the fact that Roberts denied he was involved. See *Olds v. State*, 299 Ga. 65, 75-76 (2) (786 SE2d 633) (2016) (explaining that

22

the probative value of evidence depends in part on whether the fact it is offered to prove is disputed and on its marginal worth in proving that fact in comparison to other available proof). And although this evidence was surely prejudicial to Roberts's defense, Rule 403 requires exclusion only when "*unfair* prejudice substantially outweighs probative value." *Anglin v. State*, 302 Ga. 333, 337 (3) (806 SE2d 573) (2017) (citation and punctuation omitted). And given its strong probative value, this intrinsic evidence was not the evidence of "scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect," that Rule 403 contemplates excluding. *Johnson*, 312 Ga. at 493 (4) (citation and punctuation omitted). Thus, the trial court did not abuse its discretion in admitting this limited evidence. See *Smith*, 307 Ga. at 271-273 (2) (c) (affirming admission of evidence as intrinsic despite trial court's having admitted it under Rule 404 (b)).

(c) That leaves the rest of the evidence of the armed robbery. Evidence that did not directly relate to the shell casing or identify Roberts as the person who possessed, shot, and left with the gun was

23

not admissible as intrinsic evidence. But under these circumstances, any error in admitting the rest—like the details of the sexual encounter, the fact that Mendoza was injured during the incident, and the state of Mendoza's apartment after Roberts left—was harmless.[5]

A non-constitutional evidentiary error requires reversal only if it "harm[s] a defendant's substantial rights," and we determine whether such harm occurred by asking whether it is "highly probable that the error did not contribute to the verdict." *Williams v. State*, 313 Ga. 443, 448 (1) (870 SE2d 397) (2022). As part of that determination, we review all the evidence de novo, after setting aside the evidence admitted in error, and "we weigh the remaining evidence as we would expect reasonable jurors to have done so." Id. (cleaned up).

Here, the evidence that was properly admitted against Roberts, although circumstantial, was quite strong. The intrinsic evidence

---

[5] We do not decide whether the evidence of the armed robbery as a whole was admissible under Rule 404 (b) for identity or any other purpose.

from the armed robbery placed the murder weapon in Roberts's hands just nine days before the murder. Roberts admitted to having been with Pettway earlier on the night of the murder, which cell-tower records and surveillance-video footage confirmed. Cell-tower records placed both Roberts and Pettway, around the time of the murder, in the area where Pettway's body was later found. A cigarette butt bearing Roberts's DNA was found at the scene near Pettway's body. There was testimony that Roberts asked Glover to help him destroy Pettway's car just hours after the murder and that then—as corroborated by cell-tower records and surveillance video—the pair set out to accomplish that job by setting fire to the car in an abandoned lot. There was testimony that Roberts was in possession of a red backpack just hours after the murder, as well as testimony that Pettway had been carrying a red backpack on the evening of the murder. And Roberts, when confronted with cell records and video evidence implicating him, had no explanation other than that it was all "a lie."

In light of this very strong evidence, it is highly probable that

25

the extra details of the armed robbery did not contribute to the verdicts. Those details, while certainly not helpful to Roberts's case, were not unusually inflammatory. See generally *Chavez v. State*, 307 Ga. 804, 809 (2) (a) (837 SE2d 766) (2020) (noting that evidence of prior convictions for less serious crimes is "not likely to inflame the jury's passions in a murder case"). Cf. *Heard*, 309 Ga. at 91-92 (3) (g) (concluding that prejudicial effect of other-acts evidence was "substantial" because of the egregious means by which the earlier crime was committed). And the trial court's limiting instruction also helped mitigate the prejudicial effect of those details: by instructing the jury to consider the armed-robbery evidence "only insofar as it may relate to" the issue of "the identity of the perpetrator," the trial court effectively directed the jury's attention to the evidence that was intrinsic and away from the extraneous details. See *Johnson*, 312 Ga. at 494 (4) (noting that the prejudicial effect of certain evidence "was mitigated by the trial court's instruction limiting the jury's consideration of that evidence"). Given that instruction and the strong evidence against Roberts, any error in admitting this

26

evidence was therefore harmless.

*Judgment affirmed. All the Justices concur.*