NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: March 4, 2025

S24A1237. CALLAWAY v. THE STATE.

PINSON, Justice.

Mikeal Callaway was charged with malice murder and other crimes after going on an early morning shooting spree in his SUV. A jury convicted him on all counts, and he now appeals his convictions on numerous grounds.[1] For the reasons set out below, we affirm his

---

[1] Callaway was indicted on May 10, 2018, in DeKalb County for crimes related to the DeKalb pair of shootings. The charges were for malice murder (Count 1), two alternative counts of felony murder (Counts 2-3), seven counts of aggravated assault (Counts 4-10), possession of a firearm by a convicted felon (Counts 11), two counts of possession of a firearm during the commission of a felony (Counts 12-13), and fleeing a police officer (Count 14). The jury returned a guilty verdict on all counts following trial on January 27 through January 30, 2020. Callaway was sentenced to life without parole for malice murder. The two counts of felony murder were vacated by operation of law, and one count of aggravated assault (Count 4) merged with the malice murder count. He was further sentenced to 20 years on each remaining count of aggravated assault (Counts 5-10), with each sentence consecutive to the prior count, and 12 months of probation for the fleeing count consecutive to the aggravated assault counts. Callaway timely moved for a new trial, raising the same claims that he now raises before this Court. The trial court denied his motion for new trial. Callaway timely appealed to this Court, and the case was docketed to the August 2024 term of this Court and submitted for a decision on the briefs.

convictions.

1. The shooting spree spanned five miles, four hours, and two counties (Fulton and DeKalb) beginning late on February 21, 2018 and continuing into the early morning hours of February 22, 2018. The evidence of each of the shootings (four in total) is recounted below, viewed in the light most favorable to the jury's verdicts.

(a) *The Diggs Shooting — Fulton County*

Nathaniel Diggs was working as a cook in Atlanta at the time of the shooting. On the night of February 21, 2018, he got off work at 11:30 p.m. To go home, he took I-20. While driving, he saw bright headlights in his mirrors, "like somebody had the high beams right behind [him]." Diggs moved over a lane to let the vehicle pass, and an SUV pulled up alongside him.

Suddenly Diggs's window burst. He testified that he did not know what was happening, but he pulled over to the shoulder of the highway. When he did, he realized he had been shot, so he got in the back of his car and laid down. A passerby called 911, and EMS and police arrived. After being taken to the hospital, Diggs was told that

he had been shot nine times — in his stomach, back, and both legs. Based off the time he left work, Diggs estimated that he was shot around midnight.

(b) *The Fisher Shooting — Fulton County*

Around 2:00 a.m., Tracy Fisher was driving to his apartment. He exited I-20 onto Fulton Street in Atlanta. While leaving the interstate, he saw a silver, Infiniti SUV exit behind him. Fisher kept driving and eventually came to a stop sign. While stopped, Fisher looked to his right and saw that the SUV had pulled alongside him. The driver of the SUV "look[ed] at him" and "stare[d] at him." Fisher testified that the driver did not "look in a normal state." Seeing the strange behavior of the other driver, Fisher accelerated to get away.

As soon as he accelerated, Fisher heard shots come from the SUV. He turned his head while driving away and saw the shooter's face and the muzzle flash of the gun. One of the bullets then struck Fisher, ultimately paralyzing him from the chest down. Unable to control his car, he collided with a parked vehicle and his car flipped onto its side. Police and EMS arrived a few minutes later.

Police recovered shell casings and a magazine from the scene. Several hours after the shooting, they were able to conduct a photo lineup with Fisher, who was then recovering in the hospital. From the lineup, Fisher identified Callaway as the person who looked most like the shooter. Fisher identified Callaway as the shooter at trial.

(c) *The Bankston Shooting — DeKalb County*

Nicholas Bankston was celebrating his birthday with his family in the early morning hours of February 22. He and his fiancée left his mom's home shortly after midnight. They first went to his aunt's home to pick up some of Bankston's younger siblings, and then they went to pick up other siblings from his brother's home. A few hours later, he drove the group back to his mom's home. His fiancée, Abby, was in the passenger seat, and his five siblings — A.L., N.B., C.L., Z.B., and S.L. — were in the backseats. When the group got to his mother's gated subdivision shortly before 3:30 a.m., they could not get the entry gate to open, so they went to the entrance on the other side of the complex to see if their gate key would

work there.

When they got to the other entrance, a silver SUV pulled up on the driver's side of Bankston's car, about 10 feet away. Shots came through the SUV's passenger window and struck the driver's side door and window of Bankston's car. The children in the backseat ducked to the floor. Abby was not hit. But Bankston was struck in the head by a bullet. By the time paramedics arrived, he was dead.

One of Bankston's siblings testified that the group did not see the other car or where the shots were coming from. But another witness, Bobby Frazier, saw everything. He was delivering newspapers that morning, and he saw the shooting unfold along his route. He testified that the vehicle that came up to the Bankston car and from which shots were fired was a silver Infiniti SUV with a dealer tag. When he saw and heard the shots, he sped up to leave the area. A few moments later, the SUV passed Frazier and turned down another road. At that point, Frazier went back to the scene of the shooting, where he called police and gave a statement once they arrived. Police spoke to the witnesses at the scene and put out a BOLO for a

silver Infiniti SUV.

(d) *The McMillon Shooting — DeKalb County*

Darryl McMillon was driving to catch a commuter shuttle around 4:45 a.m. on February 22. As he drove down Gresham Road, he saw a vehicle parked just off the road. At first, he thought it might be a police car doing speed checks. As he passed the vehicle, he saw that it was a silver SUV. Then he heard gunshots. McMillon testified that his instincts as an Army veteran kicked in, and he crouched down as he continued to drive — unsure where the shots were coming from or if they were directed at him. He did not hear any glass breaking or any other noise to indicate his vehicle had been hit, so he kept driving and went about his day.

While continuing to drive, the low tire pressure indicator came on in McMillon's car, but he assumed this was caused by the cold weather. That evening on his way home, McMillon's tire blew out. Roadside assistance came, changed the tire, and McMillon completed his journey home. It wasn't until several days later that McMillon noticed what appeared to be bullet holes on the side of his

car. He then contacted his brother-in-law, who worked as a narcotics detective in another town. On his brother-in-law's advice, McMillon reached out to DeKalb County police and then to a homicide detective at the department. McMillon had seen coverage of the other shootings on the news and realized that it might have been the same person who shot at his car.

(e) *The Aftermath*

After the McMillon shooting, Callaway went to a Walmart shortly after 6:00 a.m. Surveillance video from the store shows that he arrived in a silver SUV, bought several cans of spray paint, and left in the same SUV. Callaway appears to have spray painted the SUV black in an attempt to cover up the shootings. A Walmart receipt for the spray paint was found in the hastily painted SUV, a GBI fingerprint expert testified that Callaway's prints matched those on a spray-paint can's cap found in the SUV, and fourteen cans of black spray paint were found in the garbage can at Callaway's mom's home.

Sometime after Callaway painted the SUV, police were able to

track the vehicle through the manufacturer's GPS locator service. The GPS led them to Callaway's mother's home. The police chose not to approach the home or vehicle initially, instead staking out the location and staging uniformed officers nearby in case someone tried to flee. Eventually, Callaway and his girlfriend, Keshun Booker, came out of the home and got into the now-black SUV. When they started driving, Callaway noticed police and accelerated rapidly. Marked police cruisers activated their sirens and lights and pursued Callaway's vehicle. Shortly after the pursuit began, Booker jumped out of the moving SUV. Callaway then led police on a chase that exceeded speeds of 100 miles per hour, but police were eventually able to immobilize the SUV and arrest Callaway. A 9mm handgun was found on the floor on the driver's side of the car. A later search of the vehicle also turned up the spray paint cap, Walmart receipt, live ammunition for an AR-15, two spent rifle casings, and a 9mm pistol.

An expert witness for the State testified that particles consistent with gunshot residue were found on Callaway's hands, on his

shirt, and in the car. Another expert testified that the 9mm bullets found at the Fisher shooting matched the gun found in Callaway's car.

Booker was interviewed by police. She gave a written and audio recorded statement. In these statements, she told police that she had been with Callaway during the night while he carried out the shootings. She said that she would cover herself with a hoodie and try to remain still so that she would not be shot. Booker also testified that Callaway was high on Adderall and "X pills." He would get paranoid when high, and that is what provoked him to shoot at other drivers. She also said that Callaway would beat her when he was high.

At trial, Booker admitted to seeing the silver Infiniti SUV the day before the shootings and that it was spray-painted black the next day, but she refused to say who painted it. She also admitted to jumping out of the SUV when Callaway ran from police. But she recanted her testimony about the shootings, saying that she only made her earlier statements because she was told she would go to

jail and have her children taken from her if she didn't corroborate the police department's version of events. The State impeached her testimony with her prior statements to police and prior statements made during an interview with the prosecutor and an investigator with the District Attorney's Office. The State also introduced testimony that Booker had not cooperated with its subpoena and that she was being held in jail on a material-witness warrant.

2. Callaway claims that the evidence was not sufficient as a matter of constitutional due process to authorize a jury to find him guilty of several of his crimes. Evidence is sufficient as a matter of due process if, viewed in the light most favorable to the verdict, a rational trier of fact could have found "the essential elements of the crime beyond a reasonable doubt." *McCullum v. State*, 318 Ga. 485, 489 (2) (a) (899 SE2d 171) (2024) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979)).

(a) Callaway contends that the evidence was not sufficient to authorize a jury to find him guilty of four counts of aggravated as-

sault for four of the children in the backseat of the car. The indictment alleged that Callaway committed aggravated assault against each of these victims by "shooting at or in the direction of" each of them. Callaway argues that the evidence only showed that he shot from close range at the driver's door and its window — not in the direction of the car's rear seats. Because he did not shoot "at or in the direction of" those in the backseat, Callaway argues, the State's evidence was not sufficient to prove the facts alleged in the indictment.

This claim fails. The evidence showed that Callaway shot at the car the children were riding in. The jury was authorized to conclude that by firing a gun repeatedly into the car, causing the children in the backseat to duck to the floor, Callaway used a "deadly weapon" in a way that placed the children in "reasonable apprehension of immediately receiving a violent injury," even though he later claimed that he was only shooting towards the front seat of the car. OCGA §§ 16-5-20 (a) (2) & 16-5-21 (a) (2) (aggravated assault with a deadly weapon).

11

(b) Callaway also challenges the sufficiency of the evidence as to venue for his conviction of aggravated assault against McMillon. He contends that no one with personal knowledge testified to the location of the shooting, Gresham Road, being in DeKalb County. He argues that an Atlanta Police Department detective who testified about venue did not investigate the Gresham Road shooting himself. Because no one else with personal knowledge testified to venue, Callaway contends, the State failed to meet its burden in proving venue.

This claim fails. Even putting aside the detective's testimony, other evidence was sufficient to authorize the jury to conclude beyond a reasonable doubt that venue was proper in DeKalb County. There was evidence that McMillon went to the DeKalb County police department to file a report about his car being shot, and those police officers were the ones who came to inspect his vehicle. See *Smith v. State*, 295 Ga. 283, 288 (2) (759 SE2d 520) (2014) (noting that evidence of which police department responded to a crime can help es-

tablish venue). And Frazier separately testified that his paper delivery route was in DeKalb County and that this route took him down Gresham Road — the road where the McMillon shooting occurred. Taken together, this evidence was enough to authorize the jury to find beyond a reasonable doubt that venue was proper in DeKalb County. See *Worthen v. State*, 304 Ga. 862, 865 (3) (a) (823 SE2d 291) (2019) ("The State may meet its burden [to prove venue] at trial using either direct or circumstantial evidence.").

3. Callaway contends that evidence of the Fulton County crimes should have been excluded under OCGA § 24-4-404 (b) (Rule 404 (b)), which limits the admission of "[e]vidence of other crimes, wrongs, or acts," which is sometimes called "extrinsic" or "other-acts" evidence. *Roberts v. State*, 315 Ga. 229, 235-236 (2) (a) (880 SE2d 501) (2022). But those limits do not apply to "intrinsic" evidence. Id. The line between "extrinsic" and "intrinsic" evidence is not always bright, but the basic distinction is whether the evidence may be understood as "direct evidence of the charged crime" or only "evi-

dence of *other* crimes subject to Rule 404 (b)." Id. at 236 (2) (a) (citation and punctuation omitted) (emphasis in original). That said, even evidence of other crimes is still intrinsic if it is (1) evidence of "an uncharged offense arising from the same transaction or series of transactions as the charged offense," (2) "necessary to complete the story of the crime," or (3) "inextricably intertwined with" the evidence of the charged offense. Id. In applying this standard, we have also said that evidence that has to do with "the chain of events explaining the context, motive, and set-up of the crime" is properly admitted as intrinsic evidence if it is "linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." *Harris v. State*, 310 Ga. 372, 378 (2) (b) (850 SE2d 77) (2020) (cleaned up). We review the admission of intrinsic evidence for an abuse of discretion. *Abbott v. State*, 311 Ga. 478, 483 (2) (858 SE2d 696) (2021).

Applying this standard here, the trial court did not abuse its discretion in admitting the evidence of the Fulton County shootings

14

as intrinsic evidence. Callaway went on a shooting spree within a tight geographic and temporal span — five miles and four hours. Evidence relating to the identification of Callaway as the shooter came from the victims of the Fulton County shootings. And the investigation of the crimes and arrest of Callaway were undertaken jointly by DeKalb and Fulton law enforcement agencies. Because the evidence related to the Fulton County shootings is linked closely in time and circumstance and is an integral and natural part of the story of Callaway's shooting spree, the trial court did not abuse its discretion in admitting it. See *Brown v. State*, 307 Ga. 24, 29 (2) (834 SE2d 40) (2019) (evidence of an uncharged burglary committed in the same week as the charged crimes was intrinsic to the charged crimes because it was part of the same "crime spree").

Callaway contends that the evidence was not intrinsic because it was not needed to prove the crimes he was charged with. But "[i]n assessing whether evidence is necessary in this context, we have noted that 'necessary' is not used in a strictly literal sense, but rather, refers to what evidence is reasonably necessary for the State

15

to complete the story of the crime." *Jennings v. State*, 318 Ga. 579, 584 (1) (899 SE2d 210) (2024) (citation and punctuation omitted). And here, there is little question that evidence of part of a shooting spree within this relatively brief span of time and location is important context that is reasonably necessary to explain to the jury how the crimes at issue unfolded. *Heade v. State*, 312 Ga. 19, 26 (3) (860 SE2d 509) (2021) (holding that other crimes committed during defendant's crime "spree" were "reasonably necessary to complete the story for the jury").

Callaway finally contends that the trial court erred by not giving a contemporaneous limiting instruction to the jury about the Fulton County evidence. Although "a limiting instruction generally is not warranted for intrinsic evidence," *Anderson v. State*, 313 Ga. 178, 183 (3) (a) (869 SE2d 401) (2022), here the trial court gave a limiting instruction, albeit at the close of evidence. Callaway offers no authority for the idea that a contemporaneous instruction was required when an instruction was ultimately given, and we are aware of none.

16

4. Callaway contends that the State committed prosecutorial misconduct in a few instances, but these claims are not preserved for appellate review.

(a) Callaway contends that the prosecutor put facts not yet in evidence before the jury in the guise of questions in violation of Rules 3.7 (a) and 3.8, Comment 1 of the Georgia Rules of Professional Conduct[2] and impermissibly commented on the veracity of a

---

[2] Rule 3.7 (a) states that:
A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:
  (1) the testimony relates to an uncontested issue;
  (2) the testimony relates to the nature and value of legal services rendered in the case; or
  (3) disqualification of the lawyer would work substantial hardship on the client.

Rule 3.8, Comment 1 provides that

A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence. Precisely how far the prosecutor is required to go in this direction is a matter of debate and varies in different jurisdictions. Many jurisdictions have adopted the ABA Standards of Criminal Justice Relating to the Prosecution Function, which in turn are the product of prolonged and careful deliberation by lawyers experienced in both criminal prosecution and defense. Applicable law may require other measures by the prosecutor and knowing disregard of those obligations or a systematic abuse of prosecutorial discretion could constitute a violation of Rule 8.4: Misconduct.

17

witness in front of the jury. These claims are waived: Callaway did not object to this line of questioning at trial, and claims of prosecutorial misconduct are not subject to review for plain error.[3] See *Grissom v. State*, 296 Ga. 406, 411-412 (3) (768 SE2d 494) (2015).

(b) Callaway claims that the prosecutor engaged in improper closing argument because his closing argument was "pure emotionalism." This claim is also waived because Callaway did not object to the closing argument at trial, see *Grier v. State*, 305 Ga. 882, 887 (3) (828 SE2d 304) (2019), and claims that improper statements were made in closing argument are not subject to review for plain error. *Simmons v. State*, 299 Ga. 370, 372-373 (2) (788 SE2d 494) (2016).

5. Callaway raises a pair of claims that his trial counsel's assistance was constitutionally ineffective. To prevail on a claim of ineffective assistance of counsel, Callaway must show that his trial counsel performed deficiently and that the deficiency prejudiced him. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt

---

[3] Callaway does not appear to claim that the trial court erred in admitting evidence, only that the prosecutor's conduct was improper.

18

2052, 80 LE2d 674) (1984). To show deficiency, Callaway must establish that counsel "performed his duties in an objectively unreasonable way, considering all the circumstances and in light of prevailing professional norms." *Evans v. State*, 315 Ga. 607, 611 (2) (b) (884 SE2d 334) (2023). And the law "recognizes a 'strong presumption' that counsel performed reasonably, and the defendant bears the burden of overcoming this presumption." Id. An attorney's decisions as to what evidence to present is "a matter of trial strategy," and "such decisions will form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." Id. at 611 (2) (c) (cleaned up). To show prejudice, Callaway "must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different." *Rashad v. State*, 318 Ga. 199, 208 (3) (897 SE2d 760) (2024) (cleaned up). If Callaway "fails to make a sufficient showing on one part of the *Strickland* test, we need not address the other part." *Starks v. State*, 320 Ga. 300, 304 (2) (908 SE2d 614) (2024) (citing *Rashad*, 318 Ga. at 208 (3)).

19

(a) Callaway contends that his counsel rendered ineffective assistance by failing to object to the prosecutor's closing argument. Some of the statements that Callaway argues warranted objection include: "[t]his man put a bullet in [Bankston's] head, and he deprived that family of him for the rest of their lives"; "you're going to hold him responsible for that"; and "[y]ou're going to find Mikeal Callaway guilty because you're going to hold him responsible for tearing Mr. Bankston away from his family. Because he was a good man, and he did nothing to deserve what Mikeal Callaway did to him."

Counsel's failure to object to these comments during argument was not deficient performance because those comments were not improper. *Cochran v. State*, 305 Ga. 827, 834 (2) (d) (828 SE2d 338) (2019). Prosecutors "may forcibly or even extravagantly attempt to impress upon the jury the enormity of the offense and the solemnity of their duty." *Nundra v. State*, 316 Ga. 1, 11 (4) (b) (885 SE2d 790) (2023) (citation and punctuation omitted). That is all that the prosecutor did here. He impressed upon the jury the gravity of the crime

— particularly the murder of Bankston — and told them it was their duty to do justice. This argument fell well within the "wide latitude" that prosecutors are given in closing argument. *Summerville v. State*, 320 Ga. 60, 62 (2) (907 SE2d 604) (2024) (citation omitted).

(b) Callaway contends that his counsel rendered ineffective assistance by failing to object to the prosecutor vouching for a witness's credibility during questioning.[4] Callaway specifically points to statements made during the impeachment of Booker that he contends boosted her earlier statement's credibility:

> Q. And do you remember I said, but I don't think you did any of that?
> A. Right, because I didn't.
> Q. Right. And I told you I believed you were telling me what?
> A. The truth.
> Q. That's what I asked you to do; right?
> A. Yes.

---

[4] Callaway's brief refers to this claim as ineffectiveness for failure to object to "improper bolstering." But "bolstering" refers to a specific scenario in our law — when a witness testifies about the credibility of another witness. See *Brown v. State*, 302 Ga. 454, 460-461 (2) (b) (807 SE2d 369) (2017) ("When a witness's statement does not directly address the credibility of another witness, however, there is no improper bolstering."). Callaway's argument focuses instead on the *prosecutor's* statements about a witness's credibility, which is not a true "bolstering" claim. So we address the substance of his argument that counsel was ineffective for failing to object to the prosecutor's line of questioning about the witness's credibility.

Counsel was not deficient in failing to object to this line of questioning. We have said that "decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." *Bates v. State*, 313 Ga. 57, 62 (2) (867 SE2d 140) (2022) (citation omitted). In these circumstances, it would not be unreasonable for trial counsel to decide as a matter of trial strategy to avoid objecting to questions posed while the State impeached its own witness. Objections could distract the jury from the witness's credibility issues. Objections could also give the jury the impression that the defense did not want the prior inconsistent statements to be admitted because they were the truthful account of events. And the alleged misconduct was brief and not the focus of the questioning. So we cannot say that no reasonable lawyer would fail to object in these circumstances.

6. Callaway contends that the cumulative effect of errors at trial denied him a fundamentally fair trial. This claim fails because

he has not established any error. See *Wynn v. State*, 313 Ga. 827,

840 (6) (874 SE2d 42) (2022).

*Judgment affirmed. All the Justices concur.*