**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: March 17, 2026

S26A0389.  WILLIAMS v. THE STATE.

PINSON, Justice.

Ryan Christopher Williams was convicted of felony murder and other crimes in connection with the death of Kris Holt.[1] On appeal, he contends that the trial court abused its discretion by denying his

---

[1] Williams beat Holt with a metal implement and then a baseball bat on July 18, 2018, and Holt died on March 13, 2019. On June 14, 2019, a Fulton County grand jury indicted Williams for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), felony murder predicated on aggravated battery (Count 3), aggravated assault (Count 4), aggravated battery (Count 5), and criminal damage to property in the second degree (Count 6). Williams was tried by a jury from December 12 to 19, 2022. The jury found Williams not guilty of malice murder but guilty of the remaining charges. The trial court sentenced Williams to life in prison for felony murder predicated on aggravated assault and five years in prison for criminal damage to property in the second degree, to be served consecutively. The remaining charges merged for sentencing or were vacated by operation of law. Williams filed a timely motion for new trial, which he later amended through new counsel. The trial court held an evidentiary hearing on the motion for new trial and then denied the motion on January 2, 2025. Williams filed a timely notice of appeal directed to the Court of Appeals, which transferred the appeal to this Court on September 11, 2025. The case was docketed to the term of this Court beginning in December 2025 and submitted for a decision on the briefs.

motion for continuance, that the State committed prosecutorial misconduct by failing to turn over certain evidence until the eve of trial, that trial counsel gave ineffective assistance by failing to preserve the claim of prosecutorial misconduct for appellate review, and that the trial court gave a jury instruction (which Williams does not specify) that improperly told the jury how to resolve conflicts in the evidence.

These claims fail. Williams has not shown any evidence that the trial court's denial of a continuance affected his defense. The claim of prosecutorial misconduct is not preserved for appeal. Trial counsel did not perform deficiently by failing to assert the prosecutorial-misconduct claim in the trial court and thus failing to preserve it for appeal, because the claim was meritless: there is no evidence of actual misconduct by the State. Finally, Williams does not specify what jury instruction he challenges, so he has not met his burden of showing error on that claim. So Williams's convictions are affirmed.

1. The evidence at trial showed the following. In the early morning hours of July 18, 2018, Williams's upstairs neighbor was

awakened by a "commotion." The neighbor jumped out of bed, went to his balcony, and saw Williams in the street "beating on" another man with a bat. The victim — later identified as Holt — was in a parked car with a shattered windshield, and Williams was pulling him out. Williams was yelling, at the top of his lungs, "[B]**ch a** n**ger. I told you to stop f**king playing with me. I told you the day was coming. I don't know why I'm the one you're playing with. I'm f***ing Rock Star. You gonna stop playing with me." Holt was screaming for help.

Eventually Williams let Holt go. Holt was stumbling and "discombobulated," but he got back into his car and started to drive away. The neighbor called 911 — the call came in at 3:14 a.m. — because he could tell from the way Holt was driving that "he wasn't going to make it far." In the aftermath, Williams, who was spattered with blood, swept up the broken glass and picked up Holt's phone from the ground and threw it in the trash. At that point Williams said to the neighbor, "I apologize. You guys know I get F'd up sometimes."

Holt made it home, called 911 from his watch, and was taken to the hospital. When a police officer arrived at the hospital, Holt appeared "severely injured" and lethargic, and he spoke slowly. Holt was able to tell the officer that the assailant was "Rock Star," which was Williams's nickname in the neighborhood.

Police contacted Williams, who agreed to an interview. After waiving his *Miranda*[2] rights, Williams told police that Holt had come to his home to "get some drugs" from a dealer Williams knew. Holt had promised to pay Williams a fee after the transaction. But when the two returned to Williams's home after buying the drugs, Holt suggested that Williams have sex with him instead. Williams got angry and threw a drink at Holt. Holt then attacked Williams with a metal implement that he had in his car. Williams, however, took the implement away and started to beat Holt. Then Williams got a baseball bat and "beat him some more." Along with his interview, Williams prepared a written statement that was largely consistent with his interview. Later, at trial, Williams testified in his

---

[2] *Miranda v. Arizona,* 384 US 436 (1966).

own defense and gave substantially the same account.

Holt died eight months after the attack, on March 13, 2019, and Williams was charged with his murder. At trial, the State introduced testimony from medical experts to connect Holt's death to his head injury eight months earlier. The doctor who treated Holt the night he was attacked testified that Holt arrived at the hospital with a "very severe" traumatic brain injury. The doctor testified that the emergency procedures he and his team performed on Holt — including inserting a breathing tube and removing a part of Holt's skull to relieve brain swelling — "saved his life that night." The State also called the emergency room doctor who had treated Holt on the night he died. That doctor said that Holt was brought in after having a seizure at home, and that he was unresponsive and in cardiac arrest. Finally, the medical examiner who performed the autopsy testified that seizures can be a result of a traumatic brain injury, and that Holt's brain showed evidence of such an injury, including discoloration, scarring, and encephalomalacia, or a "softening" of the brain.

Based on her autopsy and on Holt's records from his initial treatment and rehabilitation, the medical examiner determined that the case was a homicide. The cause of death was a seizure brought on by a traumatic brain injury caused by blunt force trauma.

Williams called his own expert to rebut the State's witnesses. Williams's expert, a retired forensic pathologist, testified that Holt likely died from a heart attack not related to the beating. Holt had high blood pressure that was not well treated and that had caused kidney damage. The pathologist said that on the night Holt died, the accumulated effects of high blood pressure caused a sudden "heart rhythm disturbance" in which Holt's heart rate and blood pressure deteriorated to an unsurvivable level. The pathologist further testified that Holt's seizure on the night he died could have been a part of his body's response to the cardiac arrest as his brain was "not getting enough oxygen," which is a "very common" occurrence, and not related to a traumatic brain injury. He testified that what the State alleged happened — cardiac arrest brought on by a seizure whose root cause was a head injury suffered more than a few weeks earlier

— is "vanishingly rare."

2. Williams contends that the trial court should have granted a continuance to give the defense expert time to review certain medical records that the defense received only days before trial. The decision whether to grant a continuance is "addressed to the sound legal discretion of the court." OCGA § 17-8-22. See also *Harris v. State*, 314 Ga. 370, 373 (2022). And to obtain a new trial based on the denial of a continuance, an appellant must show not only that the trial court abused that discretion, but also that he was "harmed by that denial." See *Blalock v. State*, 316 Ga. 330, 338 (2023).

(a) On the first day of trial, Williams moved for a continuance. Williams contended that the medical records that the State had provided to the defense in discovery were not complete until three days before trial. According to Williams, the defense had been asking the State for records from Holt's treatment at the hospital on March 13, 2019, the day he died, but the State repeatedly told the defense that the records did not exist. Finally, on the Friday afternoon before the

7

Monday when the trial was set to begin, the State provided the missing March 13 records. In Williams's view, the missing records were exculpatory, and the State's failure to provide them earlier was a *Brady*[3] violation. Williams contended that the trial must be continued so that the defense expert could review the new records and so that the defense could subpoena witnesses referenced in the records. Williams also noted that the defense expert was not available to testify in person during the trial as it was then scheduled, and he argued that it would be prejudicial for the defense expert to testify by videoconference when the State's experts were all in person. The trial court denied the motion to continue.

After Williams was convicted, at the hearing on his motion for a new trial, the trial prosecutor testified about his "several months" of efforts to get the missing records. The prosecutor subpoenaed the records, emailed and called the hospital, and checked the file at the medical examiner's officer, and he was repeatedly told the records did not exist. The prosecutor also went to the hospital in person more

---

[3] *Brady v. Maryland*, 373 US 83 (1963).

than once. The second time he went, he waited for "several hours" and told the hospital's records department that he would not leave until he had either the records or a written representation that they did not exist. On that occasion, the hospital finally provided the missing records, which consisted of "eight or nine pages." The prosecutor then turned the records over to the defense within 30 minutes of getting them. The prosecutor also testified that it did not appear that the defense had made any attempt to get the missing records, although it had the same access to the records as the State did.

(b) Even assuming that the trial court abused its discretion in denying Williams a continuance to review the new medical records, Williams's claim fails because he has not shown that he was harmed by that denial. He argues that the defense expert needed more time to review those records to inform his opinion, and that trial counsel needed more time to investigate potential witnesses revealed by the new records. But as the State correctly points out, Williams does not support with any evidence his claim that his defense was affected by the late disclosure of the missing pages of medical records. He has

not explained how his expert's analysis, conclusions, or testimony would have been different if the expert had been given extra time to review that handful of pages. Nor has he identified what additional witnesses were named in the pages that he would have called, much less established with evidence what those witnesses would have said at trial. And he has not shown how trial counsel was impaired in her cross-examination of State witnesses, because trial counsel did not testify at the motion-for-new-trial hearing and no other evidence on this point was presented. In short, Williams has not shown any evidence that his defense was affected in any of the ways he claims (or any other way) by the denial of a continuance. Without that showing, his claim fails. See *Blalock*, 316 Ga. at 339 (denial of continuance did not harm defendant where defendant did not show that expert testimony would have helped him formulate an effective defense or how the testimony would otherwise have benefitted him at trial); *Phoenix v. State*, 304 Ga. 785, 789 (2018) (to show harm from the denial of a continuance, a defendant must identify what other evidence or witnesses he would have put forth if given more time,

and "speculation and conjecture are not enough" (citation omitted)); *Geiger v. State*, 295 Ga. 648, 651 (2014) (defendant did not show he was harmed by denial of a continuance to get shell casing independently tested when the defendant also failed to get the shell casing tested before the motion-for-new-trial hearing and thus could not show what testing would have revealed).

3. In a related claim, Williams contends that, to the extent the State intentionally failed to disclose the March 13 medical records until the eve of trial, the State committed prosecutorial misconduct. But Williams did not raise any such claim in the trial court, and unraised claims of prosecutorial misconduct are not reviewed for plain error. See *Callaway v. State*, 321 Ga. 186, 193 (2025); *Grissom v. State*, 296 Ga. 406, 411–12 (2015). So this claim is not preserved for our review on appeal.

4. In his third claim related to the March 13 medical records, Williams contends that his trial counsel gave constitutionally ineffective assistance by failing to raise a claim of prosecutorial misconduct based on the State's late disclosure of those records. To prevail

11

on a claim on ineffective counsel, a defendant must show both that counsel's performance was professionally deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 US 668, 687 (1984); *Washington v. State*, 313 Ga. 771, 773 (2022). To show deficiency, the appellant must show that his lawyer performed "in an objectively unreasonable way," *Heyward v. State*, 319 Ga. 588, 592 (2024) (quotation marks omitted), which generally means showing that "no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not," *Evans v. State*, 315 Ga. 607, 611 (2023) (quotation marks omitted). To show prejudice, a defendant must show that, but for counsel's deficient performance, there was a "reasonable probability" that the result of the trial would have been different. *Heyward*, 319 Ga. at 592 (quotation marks omitted).

Williams contends his counsel should have raised a claim of prosecutorial misconduct in the trial court. To prevail on such a claim, Williams would have had to show both "actual misconduct" and "demonstrable prejudice to his right to a fair trial." *Cushenberry*

*v. State*, 300 Ga. 190, 195 (2016). And to show prosecutorial miscon-duct of the type that Williams alleges here — the State's withholding of exculpatory evidence from the defense, in violation of *Brady v. Maryland*, 373 US 83 (1963) — a defendant must show that (1) the State had evidence favorable to the defense, (2) the defense did not have the evidence and could not have obtained it "with any reason-able diligence," (3) the prosecution suppressed the evidence, and (4) had the evidence been disclosed to the defense, "a reasonable probability exists that the outcome of the proceeding would have been different." *Sauder v. State*, 318 Ga. 791, 807 (2024) (quotation marks omitted). See also *Brady*, 373 US at 87 ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the pros-ecution.").

Under those standards, any claim of prosecutorial misconduct based on the late production of the March 13 medical records would have failed. The evidence showed that the State did not withhold the

missing medical records or delay giving them to the defense. To the contrary, over a period of months, the prosecutor tried to get the records through several different methods, was consistently told they did not exist, and finally got them only when he went to the hospital and refused to leave without them. And then, once the State finally had the March 13 records, it gave them to the defense right away. In short, the record shows that the State acted properly and ethically with respect to the March 13 records. And Williams points to no other evidence that might suggest "actual misconduct" on the State's part, see *Cushenberry*, 300 Ga. at 195, or evidence that the State deliberately withheld exculpatory evidence, see *Sauder*, 318 Ga. at 807. Without any evidence of misconduct, a claim of prosecutorial misconduct would have been meritless.

Because counsel does not perform deficiently by failing to raise a meritless claim, see, e.g., *Johnson v. State*, 310 Ga. 685, 691–92 (2021), this claim of ineffective assistance of counsel fails.

5. Finally, Williams contends that the trial court erred by instructing the jury on how to resolve conflicts in the evidence. But

14

Williams does not identify the jury instruction he purports to challenge, either by pointing us to the instruction in the record or even by simply telling us what it is. He says only that some unspecified instruction from the trial court "impermissibly invaded the province of the jury and improperly influenced the jury's evaluation of disputed evidence," and then he cites one decision of this Court that does not help point us to the instruction he means. It is the appellant's burden to show error by identifying in the record the thing that he challenges on appeal and citing authority to show why that thing represents an error. See *Hornbuckle v. State*, 300 Ga. 750, 753 (2017) ("'The appellant bears the burden of proving error by the appellate record.'"); *Young v. State*, 232 Ga. 285, 290 (1974) ("The burden of showing error is upon the appellant."). See also *Jacobs v. State*, 306 Ga. 571, 575 (2019) ("[I]t is not this Court's responsibility to cull the record to find support for a defendant's claims."). By failing to identify in any way the specific jury instruction that he challenges, Williams has failed to meet that burden, and so this claim

fails.[4]

*Judgment affirmed. All the Justices concur.*

---

[4] Williams does not raise a separate claim of cumulative error, but he does refer to the cumulative effect of his claims of error in the last sentence of the introduction to the argument section of his brief. In any event, any such claim would fail because Williams has not established multiple errors. See, e.g., *Williams v. State*, 318 Ga. 83, 97 (2024).